# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                   No. CR 18-0836 JB

YVONNE MADRID,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Objection to the Presentece [sic] Report and Sentencing Memorandum, filed September 11, 2018 (Doc. 62)("Objections"). The Court held a sentencing hearing on September 20, 2018. The primary issues are: (i) whether the Court should consider, as evidence relevant to determining the weight of the Suboxone[1] smuggled into prison, testimony from a Federal Bureau of Investigation ("FBI") agent regarding the quantity of controlled substances that Defendant Yvonne Madrid allegedly attempted to supply

---

[1]Suboxone is a prescription drug, in which the active ingredient, buprenorphine, is a Schedule III controlled substance. <u>See</u> <u>United States v. Burkholder</u>, 816 F.3d 607, 610 (10th Cir. 2016). Buprenorphine, an opioid, is "commonly prescribed for treating heroin addicts." <u>United States v. Burkholder</u>, 816 F.3d at 610. In 2010, the United States Food and Drug Administration ("FDA") approved an application for a non-tablet formulation of Suboxone -- a sublingual strip, "in dosage strengths that are similar to the approved tablets; specifically, buprenorphine 2 mg/naloxone 0.5 mg and buprenorphine 8 mg/naloxone 2 mg." Application Number: 022410Orig1s000 Summary Review at 3, Center for Drug Evaluation and Research, Food and Drug Administration (Aug. 30, 2010). After several studies, the FDA determined that Suboxone can be prescribed for home use, because of its lower risk of abuse compared with heroin. <u>See</u> Daniel Genis, <u>This Anti-Heroin Drug is Now King of the Jailhouse Drug Trade</u>, Daily Beast (July 17, 2014), https://www.thedailybeast.com/this-anti-heroin-drug-is-now-king-of-the-jailhouse-drug-trade. Since its approval, Suboxone "has become a drug of abuse in its own right, resulting in prison smuggling efforts from New Mexico to Maine." Abby Goodnough and Katie Zezima, <u>When Children's Scribbles Hide a Prison Drug</u>, N.Y. Times (May 26, 2011), https://www.nytimes.com/2011/05/27/us/27smuggle.html?_r=1&hp.

in units and how much money would be made from said quantity should be considered; (ii) whether the Court should consider, as evidence that Madrid should receive a mitigating role adjustment pursuant to the United States Sentencing Guidelines Manual § 3B1.2(b) (U.S. Sentencing Comm'n 2016)("U.S.S.G."), letters from co-Defendant Christopher Chavez, Madrid's ex-husband and the intended recipient of the Suboxone that she attempted to supply pressuring Madrid to send him Suboxone in jail, instructing her on how to do it, and threatening her and her boyfriend at the time;[2] (iii) whether, in the interests of justice, the Court should vary Madrid's sentence downward to eliminate the disparity between her base offense level of 26, and her co-Defendant Chavez' base offense level of 13, when the Presentence Investigation Report, filed August 22, 2018 (Doc. 57)("PSR"), acknowledges that Madrid and Chavez were charged with the same conspiracy to distribute, see PSR ¶ 1, at 3, and that Chavez instructed Madrid on how to commit the offense, see PSR ¶¶ 6-9, at 3-4; (iv) whether, considering United States v. Cani, 545 F. Supp. 2d 1235

---

[2]The Supreme Court of the United States held, in Peugh v. United States, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described.  The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549.  Because the 2016 Guidelines were in effect at the time of Madrid's crime, the Court uses the 2016 Guidelines to calculate Madrid's sentencing range and not the recently published 2018 version.

(M.D. Fl. 2008)(Conway, J.), the Court should compare the advisory Guidelines sentence the PSR recommends -- 70 to 87 month -- with the sentencing range to which Madrid would be subject if the Court used the least serious count with which she was charged to calculate the range -- instead of, as the Guidelines direct, the most serious count -- and that the Court should vary Madrid's base offense level to 6, using the least serious count to calculate Madrid's Guidelines range, because using the most serious count to calculate Madrid's applicable Guidelines range results in U.S.S.G. § 2P1.2(c)(1)'s application, which unjustly elevates Madrid's base offense level to 26, disproportionate to the severity of her crime; and (v) whether, considering the 18 U.S.C. § 3553(a) factors, the Court should assign Madrid a below-Guidelines sentence of 6 to 12 months imprisonment followed by a term of supervised release. The Court concludes that: (i) Suboxone quantity may not be calculated by dosage, and that the FBI agent's dosage determination is arbitrary, so the Court will sustain Madrid's Objection and will not consider as evidence relevant to sentencing the FBI agent's testimony as to the units of Suboxone or their value in prison, although the Court notes that the change does not affect Madrid's base offense level, which is 26; (ii) the Court overrules Madrid's Objection requesting a minor role adjustment, concluding that Madrid played an essential role when she purchased or secured the Suboxone and provided it to Chavez' attorney, Orlando Mondragon, for delivery, and where telephone calls between her and Chavez suggest this crime is not her first time securing Suboxone for an inmate; (iii) considering the 18 U.S.C. § 3553(a) factors, including the need to avoid unwarranted sentencing disparities between similar defendants found guilty of similar conduct, and a need to promote respect for the

law, provide just punishment, afford just deterrence, and reflect the offense's seriousness, the Court denies Madrid's request to vary her sentence downward to eliminate the disparity between her sentence and Chavez' sentence; (iv) the Court declines to follow United States v. Cani, and assigns Madrid a base offense level of 26, pursuant to U.S.S.G. § 2P.12(c)(1); and (v) considering the 18 U.S.C. § 3553(a) factors, the Court concludes Madrid is entitled to some variance, and varies downward the equivalent of 1 offense level, arriving at a working range of 63 to 78 months, below the advisory Guidelines range, and assigns Madrid a sentence of 63 months of imprisonment, followed by three years of supervised release, at the bottom of the working range. The Court therefore sustains the Objections in part and overrules them in part.

## **FACTUAL BACKGROUND**

At the Plea Hearing, held before the Honorable Jerry H. Ritter, United States Magistrate Judge for the District of New Mexico, Madrid pled guilty to the Indictment. See Indictment at 1, filed March 21, 2017 (Doc. 36). See also Plea Minute Sheet at 1, filed June 1, 2018 (Doc. 52). The Indictment charges that Madrid

> unlawfully, knowingly and intentionally combined, conspired, confederated, agreed, and acted interdependently with each other and with other persons whose names are known and unknown to the Grand Jury to commit an offense defined in 21 U.S.C. §§ 841(a)(1) and (b)(1)(E), specifically, distribution of Suboxone. In violation of 21 U.SC. § 846.

Indictment at 1. The Indictment also charges that Madrid, "contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(E), provided and attempted to provide a prohibited object, specifically, suboxone, to **CHRISTOPHER T. CHAVEZ, a.k.a. 'Critter,'** an inmate of the Hidalgo County Detention

Center . . . [i]n violation of 18 U.S.C. § 1791(a)(1)."  Indictment at 2 (emphasis in Indictment).

Chavez was originally charged in <u>United States v. DeLeon</u>, CR 15-4268 JB, a case dealing with crimes that a prison gang, the Syndicato de Nuevo Mexico ("SNM"), allegedly committed through its members.  The factual background of that case, as incorporated into several of the Court's Memorandum Opinions and Orders, is provided below, including relevant footnotes:

> The Court takes its background facts from the Second Superseding Indictment, No. 15-4268, filed March 9, 2017 (Doc. 947)("Indictment").  The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, 2017 WL 6496441, No. 15-4268, filed December 18, 2017 (Doc. 1585).  The Court does not set forth these facts as findings or the truth.  The Court recognizes that the factual background largely reflects the United States' version of events and that the Defendants are all presumed innocent.

> This case deals with crimes that the Syndicato[3] de Nuevo Mexico ("SNM") allegedly committed through its members.  <u>See</u> Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Indictment at 2-3.

---

> [3]The correct spelling of "Syndicato" has been hotly debated.  The proper Spanish spelling for the word syndicate is "sindicato."  Real Academia Española, Asociación de Academias de la Lengua Española, Diccionario de la Lengua Española, <u>Sindicato</u> (23d ed. 2014).  The indictment, the media, and, at least some members of the gang, however, spell it "Syndicato."  Indictment at 2, Colleen Heild, <u>Ex-Gang Members Help Break Grip of Massive Prison Gang SNM</u>, The Albuquerque Journal, September 10, 2017, at 1.  <u>See</u> Draft Transcript of Motion Proceedings, (taken January 10, 2018) at 3:22-24 (Armijo)("I believe . . . both spellings are used by members.  We have members that have tattoos with both the Y and the I.").  The Court will spell it "Syndicato," because that is the spelling on the indictment.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. See Superseding Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members at one time. See Indictment at 3. SNM has approximately 250 members now and is led by "a 'panel' or 'mesa' (Spanish for table) of leaders who issue[] orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals; its main goal is controlling and profiting from narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment at 4. If another gang does not abide by SNM's demands, SNM may assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To preserve its power, SNM uses intimidation, threats of violence, assaults, and murder. See Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials, including Wayne Santistevan and Gregg Marcantel, inspired the Federal Bureau of Investigation's present investigation. See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133); Transcript of Motion Proceedings at 228:23-24 (held November 29, 2017)(Castellano), No. 15-4268, filed December 6, 2017 (Doc. 1547).

United States v. DeLeon, 326 F. Supp. 3d 1257, 1263-64 (D.N.M. 2018)(Browning, J.).

The Court takes the facts from the PSR. Apart from Madrid's Objection to the PSR's

description of the Suboxone quantity at issue, no one has objected to the PSR's recitation of the

facts or requested an evidentiary hearing to present more facts; the PSR's facts thus will serve as

the Court's findings of fact for purposes of this sentencing. The PSR's paragraphs 54 and 55

describe Madrid's relationship with Chavez and this case's connection to the SNM trials, as

follows:

> 54. The defendant [Madrid] is presently single, but she has been in an on and off relationship with codefendant Christopher Theodore Chavez, age 42, since 2007. They married in 2007 by telephone while he was in custody in Santa Fe, New Mexico. They divorced in 2010 because Chavez did not like that she was not there for him because she had to serve a jail term. According to the Thirteenth Judicial District Court in Grants, New Mexico, Case No. D-1333-DM-2011-0055, the defendant and Chavez married on March 23, 2011, and divorced on September 2, 2011.

> 55. Chavez is a Syndicato Nuevo Mexico gang member. Chavez has felony convictions in the New Mexico District Courts of two counts of Unlawful Taking of a Motor Vehicle, Aggravated Assault on a Police Officer, Contributing to the Delinquency of a minor, Receiving or Transferring a Stolen Motor Vehicle, Aggravated Battery with a Deadly Weapon (Great Bodily Harm), Conspiracy to Commit Aggravated Battery with a Deadly Weapon (Great Bodily Harm), two counts of Possession of Heroin, Auto Burglary, Conspiracy to Commit Auto Burglary, Residential Burglary, Larceny Over $500, and Receiving Stolen Property Over $500.

PSR ¶¶ 54-55, at 14.

Madrid was born in Albuquerque, New Mexico, and lived in Albuquerque all of her life,

with the exception of a few years "from age 8 to 12 while her father served in the military." PSR

¶ 47, at 13. See PSR ¶ 45, at 12. Madrid "denied any physical, emotional, or sexual abuse," and,

according to the United States Probation Office ("USPO")'s undisputed recitation of facts, "had a

good childhood." PSR ¶ 46, at 12. Madrid has one sister who lives in Albuquerque. See PSR

¶ 46, at 12.  Madrid's father continues to be supportive of Madrid but advised that if she lives with her parents upon her release from custody, he prefers she participate in a residential treatment program first to get help for her drug problem.  See PSR ¶¶ 47-48, at 13.  Madrid first married in 1987 and divorced in 1998.  See PSR ¶ 49, at 13.  Madrid notes her first husband was physically and mentally abusive, and that she is no longer in contact with him, although they have shared custody of a now 28-year-old son, who Madrid has not told about the instant offense, although she has written him.  See PSR ¶ 49, at 13.

Madrid got married and divorced twice more before meeting Chavez, and at least one of the marriages was to a physically abusive man who "had a problem with alcohol and drugs."  PSR ¶¶ 52-53, at 13-14.  Madrid is presently single but has been in an "on and off relationship" with Chavez since 2007.  PSR ¶ 54, at 14.  In 2007, Madrid married Chavez "by telephone while he was in custody in Santa Fe, New Mexico," and they "divorced in 2010 because Chavez did not like that she was not there for him because she had to serve a jail sentence."  PSR ¶ 54, at 14.

Madrid has been diagnosed with anxiety problems, panic attacks, bipolar disorder, borderline schizophrenia, and post-traumatic stress disorder.  See PSR ¶ 57, at 14.  Madrid "reported a history of physical, emotional, and sexual abuse at the hands of ex-partners."  See PSR ¶ 59, at 15.  Madrid "was referred for intensive outpatient counseling on February 28, 2018, due to her continued drug use.  Counseling records reflect the defendant's behavior and commitment to treatment was negative.  She was terminated from the program on March 15, 2018, as her

conditions of release were revoked."  PSR ¶ 59, at 15.

Madrid also has a history of substance abuse, including a reported past cocaine problem, past daily heroin use and a heroin problem reported as recently as 2018, and reported daily methamphetamine use from 2007 to 2015, a three-year clean period from 2015 to 2018, and then a relapse at the beginning of 2018, "when [Chavez] influenced her to use again."  PSR ¶ 60, at 15. The PSR reports that Madrid's "drug of choice is methamphetamine."  PSR ¶ 60, at 15.  Madrid participated in residential treatment programs in Arizona and New Mexico, as recently as 2009, participated in weekly group and individual counseling while on supervision in 2014, and completed substance abuse and anger management courses while at the Santa Fe County Correctional Facility in 2018.  See PSR ¶¶ 61-65, at 16.

Madrid graduated high school in 1979.  See PSR ¶ 66, at 16.  In 1981, she received a certification for office occupations from Technical Vocational Institute, currently named Central New Mexico Community College ("CNM"), and she attended business classes at CNM from 2011 to 2013, with a 4.0 grade point average, though she did not complete the program, because she went to prison.  See PSR ¶¶ 66-68, at 16.  Madrid held administrative and clerical jobs, as well as jobs as a receptionist, office clerk, and driver, for various companies, obtained through employment agencies, from 1990 through 2015, and again from 2016 through the beginning of 2018.  See PSR ¶¶ 69, 70, 73, at 17.  Between 2011 and 2013, Madrid worked part-time doing administrative work at CNM.  See PSR ¶ 72, at 17.  For three months in 2016, Madrid worked as a retail associate at Goodwill.  See PSR ¶ 71, at 17.  The PSR also reports that, "[a]ccording to

records from the Santa Fe County Correctional Facility," Madrid received four certificates of attendance "completing Modules 1 to 6 of Systematic Training for Effective Parenting from April 30, 2018, to June 11, 2018," and a certificate of achievement "for attending a session of Parenting/Session One/Understanding Yourself and Your Child on April 30, 2018." PSR ¶ 50, at 13.

The PSR includes information from pretrial services:

> 4. The defendant was placed on conditions of release on December 29, 2017, and she was referred for substance abuse treatment. The defendant failed to report for drug testing on January 15, 2018. On February 16, 2018, and February 17, 2018, she tested positive for 6-Acetylmorphine (6-AM) which was indicative of heroin use. The defendant admitted to using heroin. She was admonished for using drugs and referred to intensive outpatient substance abuse treatment. The defendant failed to report for drug testing on February 23, 2018. On February 28, 2018, and March 3, 2018, the defendant tested positive for 6-AM. She maintained regular attendance to her treatment sessions and was employed part-time; however, continued to use heroin. On March 16, 2018, she was arrested for violating her conditions of release and has remained in custody.

PSR ¶ 4, at 3. The PSR also describes Madrid's criminal history. See PSR ¶¶ 29-37, at 6-10. On October 24, 1998, Madrid was arrested and charged with aggravated assault against a household member (deadly weapon), breaking and entering, and aggravated battery against a household member. See PSR ¶ 29, at 6-7. According to the PSR:

> On October 24, 1998, the victim reported his ex-wife (the defendant) went into his vehicle and took a baseball bat. She hit his vehicle with the bat several times and then ran to the front of his residence where she struck the front door several times tearing the screen off of the front door. The defendant broke the bedroom window with the bat and put her hand inside of the window, attempting to pull on the curtains. She then left with their nine year old son who was in her vehicle. She returned after the victim went outside and drove towards him at a high rate of speed stopping close to him. The defendant punched the victim in the face and told him she was taking his son from him since he had a woman inside the house. The

defendant was located a short time later and arrested.  It was determined the defendant was in violation of an active restraining order.

PSR ¶ 29, at 6-7.  On October 25, 1998, the victim reported Madrid "called him a minimum of 11 times after she was released from jail pending" the above assault charges.  PSR ¶ 42, at 12.  Madrid told the victim not to press charges, put their son on the phone, and told the son to say he would hate the victim if the victim pressed charges, and not to go to school.  See PSR ¶ 42, at 12.  On October 26, 1998, Madrid was arrested -- an "other arrest," but not part of Madrid's criminal history for the purposes of criminal history points calculation, PSR ¶ 42, at 12 -- for violating the victim's restraining order against her, see PSR ¶ 42, at 12.  Madrid pled no contest in the Second Judicial District Court in Albuquerque, New Mexico, on October 18, 1999, to aggravated assault against a household member (deadly weapon), breaking and entering, and aggravated battery against a household member, see PSR ¶ 29, at 6-7, and received a conditional discharge and eighteen months of probation, see PSR ¶ 29, at 6-7.

On March 22, 2000, the Second Judicial District Court received notice that Madrid had an unspecified probation violation, and, because Madrid had no probation revocations on her record, the court dismissed the case on April 25, 2001.  See PSR ¶ 29, at 7.  On January 10, 2009, Madrid "was stopped for a traffic violation and found to be under the influence of alcohol."  PSR ¶ 30, at 7.  A witness observed Madrid collide into a vehicle, and almost collide into the witness' vehicle.  See PSR ¶ 30, at 7.  Madrid was charged with driving while intoxicated (first offense) and the Bernalillo County Metropolitan Court in Albuquerque, New Mexico ordered her to attend Driver's Re-education on Alcohol, Assessment, and Treatment Laws ("DWI school"), and a victim impact

panel, and to pay fees.  See PSR ¶ 30, at 7.  Subsequently, Madrid received warrants for failure to pay her financial obligations, failure to comply with screening/treatment, failure to comply with the first offender program, failure to complete the victim impact panel, and failure to complete educational services.  See PSR ¶ 30, at 7.  The case closed on August 20, 2001, once Madrid met all her obligations.  See PSR ¶ 30, at 8.  On May 3, 2001, Madrid "was stopped for a traffic violation and admitted she was driving without a valid license," PSR ¶ 43, at 12 -- an "other arrest," but not part of Madrid's criminal history for the purposes of criminal history points calculation, PSR ¶ 43, at 12.  The USPO could not locate court records detailing the disposition of this offense but notes that Madrid provided a false name and date of birth.  See PSR ¶ 43, at 12.

On February 16, 2006, Madrid attempted to cash a fraudulent check in the amount of $3,000.  See PSR ¶ 31, at 8.  For one count of forgery, Madrid received a sentence of nine years imprisonment (eight years and one day suspended, actual term 364 days), five years of probation, and $105.00 in fees.  See PSR ¶ 31, at 8.  On May 13, 2006, Madrid and a co-defendant hit a victim in the face with a hammer and stole his wallet, cell phone, watch, and vehicle.  See PSR ¶ 32, at 8.  Madrid stated that the victim was a convicted child molester, and acknowledged that she was with friends who beat the victim, but contended that she stopped the battery and never touched the victim.  See PSR ¶ 32, at 8.  On August 23, 2007, Madrid received a sentence for conspiracy to commit armed robbery, aggravated battery (great bodily harm), conspiracy to commit aggravated battery (deadly weapon), and conspiracy to commit unlawful taking of a motor vehicle (less than $2,500.00), of seven and a half years imprisonment (six and a half suspended for an actual term of

one year) and five years of probation following one year in the community custody program and $105.00 in fees. See PSR ¶ 32, at 8. Madrid's probation for the offenses commenced on October 17, 2007, and on May 19, 2009, she absconded. See PSR ¶ 32, at 9. Madrid was arrested on October 31, 2009, committed two new offenses and possessed controlled substances in violation of her probation, and had her probation revoked on April 13, 2010, after which she was sentenced to 827 days imprisonment. See PSR ¶ 32, at 8-9. On June 9, 2006, Madrid "presented two forged checks to a bank to be cashed knowing the checks were false," and "was not arrested until June 9, 2006." PSR ¶ 33, at 9. Consolidated with the offenses in paragraphs 31 and 32, Madrid received nine years imprisonment, eight years and one day suspended, five years of probation, and $105.00 in fees. See PSR ¶ 33, at 9. On October 25, 2009, Chavez reported that Madrid hit and scratched his face, and "had a three inch laceration on his face." PSR ¶ 35, at 9. Chavez stated that Madrid "has hurt him many times in the past." PSR ¶ 35, at 9. Madrid could not be located, was summoned to Bernalillo County Metropolitan Court, and, on January 7, 2010, received 180 days in jail for simple battery. See PSR ¶ 35, at 9.

On October 31, 2009, Madrid and Chavez "broke the side window of the victim's van and stole a black bag containing bottles of prescription cancer medication." PSR ¶ 36, at 10. Madrid provided a false name -- Ida Madrid -- and stated that Chavez broke into the vehicle. See PSR ¶ 36, at 10. Despite her initial statement, Madrid "took the blame" and received three years imprisonment suspended, three years of probation and $180.00 in fees for conspiracy to commit auto burglary. PSR ¶ 36, at 10. Her probation was revoked as an unsatisfactory discharge on

September 4, 2013, after she tested positive for methamphetamine and "was having contact with inmates," in violation of the terms of her probation. See PSR ¶ 36, at 10. On January 14, 2014, Madrid was paroled, and on February 18, 2014, violated her probation by testing positive for methamphetamine and opiates and received one month in jail. See PSR ¶ 36, at 10. On March 24, 2014, she was released, and on October 10, 2014, her parole was revoked after she absconded and, after her re-arrest, admitted to using methamphetamine. See PSR ¶ 36, at 10. On May 15, 2009, Madrid "forged a shoplifting citation to deceive or cheat a law enforcement officer," and "was not arrested until November 1, 2009." See PSR ¶ 37, at 10-11. She was sentenced concurrently with the sentence in the PSR's paragraph 36 for conspiracy to commit car burglary. See PSR ¶ 37, at 10.

The PSR describes the offense conduct for the offense for which the Court now sentences Madrid as follows:

> 5. The following information was obtained from investigative reports prepared by the Federal Bureau of Investigation (FBI) as contained in the United States Attorney's file.

> 6. On December 3, 2015, Christopher T. Chavez was taken into federal custody for the offense detailed in paragraph 52 of this presentence report, for which he was eventually acquitted at trial on March 25, 2018. Throughout that term of incarceration, he and **Yvonne Madrid**, who were previously married, but divorced in 2011, remained in contact with each other via telephone calls and written correspondence. Chavez' prior defense counsel on that unrelated matter was provided with an envelope containing various letters and Christmas cards by **Madrid**. On December 22, 2017, at **Madrid's** request, Chavez' previous defense counsel attempted to deliver the envelope and Christmas cards to Chavez while he was in the custody of the Hidalgo County Detention Center in Lordsburg, New Mexico. The prior defense counsel advised detention center staff that the envelope and its contents were not legal documents, but were from Chavez' family and allowed staff to inspect the contents. Subsequently, detention center staff

discovered two Suboxone strips concealed within two of the Christmas cards. The contraband was turned over to the Lordsburg Police Department, then to the Federal Bureau of Investigations (FBI) for further investigation. Chavez' prior defense counsel provided a statement to the Lordsburg Police Department then departed the Hidalgo County Detention Center. According to the FBI, had it not been for the prior defense counsel's candid interaction with detention center staff, the Suboxone would have been delivered to Chavez.

7. On December 26, 2017, agents interviewed **Madrid** who stated during recent telephone conversations, Chavez pressured her to send him Suboxone. Chavez reportedly told **Madrid** he could make $300 selling the Suboxone inside the jail and would send her some of the proceeds. **Madrid** stated she was in need of the money and agreed to do so. **Madrid** stated she does not have a prescription for Suboxone so she purchased the two strips of Suboxone from an unknown individual "on the streets" of Albuquerque for $7 per strip. **Madrid** concealed the two Suboxone strips inside of the Christmas cards and mailed them to Chavez' prior defense counsel with the intent of having the defense counsel deliver them to Chavez.

8. On January 16, 2018, the call logs were received from the Hidalgo County Detention Center. In a call on November 10, 2017, **Madrid** told Chavez an inmate at Cibola County Correctional Center in Milan, New Mexico, received the "pictures" (code for suboxone) she sent him. She also discussed sending Chavez "pictures" while being housed at the Hidalgo County Detention Center. Chavez responded stating the inmate in Milan needed to send her $100 to pay for the "pictures" she sent him. In a call on November 11, 2017, Chavez told **Madrid** he cannot get cards in the mail and mentioned she can dilute it by watering it down or ironing it (common ways to hide suboxone being sent through the mail). In a call on November 15, 2017, Chavez asked **Madrid** to get a hold of his lawyer and put a letter in the card for the attorney to give to him at court. Chavez told **Madrid** to put lots of water on the letters to break them (Suboxone) down better. She asked if $20 was okay for the pictures and she would send them to his attorney.

9. In a call on November 22, 2017, **Madrid** talked to Chavez about sending letters to his attorney. Chavez explained she needed to write a letter to his attorney to give to him on a visit. Chavez and Madrid talked about selling suboxone to another inmate housed in Luna County, New Mexico. Chavez told her it was up to her on the amount to charge this inmate and specifically said she could charge him $50 or $100. In a call on November 29, 2017, **Madrid** said she had 10 pictures for Chavez's friend and also 10 pictures for Chavez. She confirmed she sent it from Texas. On December 2, 2017, **Madrid** talked to Chavez about sending out the

package on this date and three days later she stated she did not send the package because she did not have enough pictures to send him.  On December 18, 2017, **Madrid** told Chavez she mailed the package to the attorney's office using an address from Texas.

10. The FBI agent confirmed suboxone is a Schedule III controlled substance, pursuant to the Controlled Substances Act.  According to the FBI agent, each suboxone strip involved in the instant offense had a value of approximately $100 inside a jail/prison and indicated each strip contained five doses or units which could be sold for approximately $20 per dose/unit.  Consequently, Chavez and **Madrid** are accountable for 10 doses or units of suboxone.

11. In summary, Chavez and **Madrid** conspired to illegally provide and/or possess two suboxone strips inside of the Hidalgo County Detention Center. **Madrid** received some direction from Chavez during the conspiracy; however, she had an essential role.  **Madrid** indicated Chavez pressured her to commit the offense, but she made the choice to be an active participant.  She purchased the suboxone and provided it to the attorney for delivery.  **Madrid** was supposed to receive compensation for supplying the suboxone.  The telephone calls indicate **Madrid** was involved in distributing suboxone strips to inmates on multiple occasions.

PSR ¶¶ 5-11, at 3-5 (emphasis in Indictment).  Mr. Mondragon, the attorney representing Chavez

in United States v. DeLeon, CR 15-4268 JB, had to withdraw from his representation of Chavez

on January 9, 2018, four months before trial, because Madrid involved him in this case as an

unwitting participant in distribution, and the Court had to appoint new counsel.[4]  See Order

Terminating Attorney Orlando Mondragon as to Christopher Theodore Chavez by Magistrate

Judge Gregory J. Fouratt, CR 18-0836 JB, entered January 9, 2018 (Doc. 19)(text-only entry);

---

[4]Because Chavez was originally death penalty eligible in United States v. DeLeon, he was given two counsel.  See Appointment of Attorney Orlando Mondragon for Christopher Chavez by Magistrate Judge Gregory B. Wormuth, entered December 4, 2015 (Doc. 90)(text-only entry); Order Appointing David Andersen as Learned Counsel, filed May 31, 2016 (Doc. 562).  Because of the complexity of the case, he had two attorneys for trial.  See Order Appointing John Granberg as Second Counsel, filed December 12, 2016 (Doc. 799).

Order Granting Motion to Appoint Additional Counsel, filed February 5, 2018 (Doc. 1745)(appointing Eduardo Solis to represent Defendant Christopher Chavez, as additional counsel to John Granberg).

## PROCEDURAL BACKGROUND

The Indictment charges both Chavez and Madrid, in Count 1, with conspiracy to distribute Suboxone in violation of 21 U.S.C. § 846; charges Madrid, in Count 2, with providing or attempting to provide Suboxone to an inmate, in violation of 18 U.S.C. § 1791(a)(1); and charges Chavez, in count 3, with attempt to obtain Suboxone, in violation of 18 U.S.C. § 1791(a)(2). See Indictment at 1-2. Chavez' Presentence Investigation Report, filed August 13, 2018 (Doc. 55)("Chavez PSR") assigns him a base offense level of 13, pursuant to U.S.S.G. § 2P1.2(a)(2). See Chavez PSR ¶ 8, at 5. Chavez raised objections to the Chavez PSR. See Defendant's Responses to Pre-Sentence Report, filed December 5, 2018 (Doc. 80)("Chavez Objections"). Chavez objected to the Chavez PSR's calculation of drug quantity based on an unnamed FBI agent's -- identified in the Addendum as Bryan Acee, see Addendum to the Presentence Report at 1, filed September 14, 2018 (Doc. 64)("Addendum") -- proffer regarding the number of doses available in a single strip of Suboxone, and averred that Chavez' base offense level should be 6, pursuant to U.S.S.G. § 2D1.1. See Chavez Objections at 1. The Court sustained Chavez' Objection to the drug quantity calculation in its sentencing opinion, but noted that Chavez' base offense level remained 13, because his Guidelines range is calculated using the count that produces the highest offense level, which, in Chavez' case, is his violation of 18

U.S.C. § 1791(a)(2), attempt to possess contraband in prison, corresponding to Guidelines provision U.S.S.G. § 2P1.2, which is not drug quantity dependent. See United States v. Chavez, CR 18-0836 JB, 2018 WL 6621283, at *7-9, Memorandum Opinion and Order at 20-21, filed December 18, 2018 (Doc. 90)("Chavez MOO"). See also Chavez PSR ¶ 15, at 5 (calculating base offense level as 13); Chavez PSR ¶ 23, at 6 (calculating total offense level as 13). The Court upheld the Chavez PSR's calculation of Chavez' criminal history category of VI and offense level of 13, producing a Guidelines range of 33 to 41 months. See Chavez MOO at 34, 2018 WL 6621283, at *14; Chavez PSR ¶ 71, at 18.

In the PSR, the USPO calculates Madrid's base offense level at 26 pursuant to U.S.S.G. § 2D1.1(a)(5) and § 2P1.2(c)(1). See PSR ¶ 17, at 5-6. The USPO noted that the Guidelines provision for an 18 U.S.C. § 1791(a)(1) violation is U.S.S.G. § 2P1.2, but that, pursuant to the U.S.S.G. § 2P1.2(c)(1) cross-reference, U.S.S.G. § 2D1.1 dictates the offense level, "because it results in a higher offense level." PSR ¶ 17, at 5-6. The PSR calculates the guideline imprisonment range at 70 to 87 months. See PSR ¶ 77, at 18. There is no plea agreement in this case. See PSR ¶ 78, at 18. Madrid filed the Objections, attaching four exhibits: a Chemical Analysis Report, filed September 11, 2018 (Doc. 62-1); Letters from Christopher Chavez to Yvonne Madrid (undated), filed September 11, 2018 (Doc. 62-2)("Threatening Letters"); Letters from Christopher Chavez to Yvonne Madrid (undated), filed September 11, 2018 (Doc. 62-

3)("Instructing Letters"); and Certificates of Achievement for Yvonne Madrid, filed September 11, 2018 (Doc. 62-4)("Certificates").

1. **<u>The Objections</u>.**

In the Objections, Madrid requests "that the court find she was a minor participant, that the court vary downward, and requests a sentence of six to twelve months." Objections at 1. Madrid raises an Objection to the PSR's Guidelines application, and several non-Guidelines-application based requests in the Objections; she admits the application-based Objection does not alter her offense level. <u>See</u> Objections at 1 n.1. Madrid notes that the PSR calculates her total offense level at 23, her criminal history points at 8, resulting in a criminal history category of IV, and, thus, the

PSR calculates a Guidelines sentence range of 70 to 87 months.[5]  See Objections at 2 (citing PSR

¶¶ 17, 26, 39, at 5-6, 11)[6].

    First, Madrid objects to the PSR's determination of smuggled Suboxone quantity as 10

---

[5]The Court, pursuant to U.S.S.G. § 3E1.1(b), decreases Madrid's offense level by one level, because she has accepted responsibility for her offense.  The PSR states that, pursuant to U.S.S.G. § 3E1.1(b), Madrid "assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty."  PSR ¶ 25, at 6.  The United States notes that Madrid "has assisted authorities in the investigation and prosecution of this matter by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently."  See United States' Sealed Motion for Downward Adjustment in Defendant's Offense Level ¶ 3, at 1, filed September 28, 2018 (Doc. 69)("Motion").  Pursuant to U.S.S.G. § 3E1.1(b), therefore, the United States requests a downward adjustment in Madrid's offense level of one additional level.  See Motion ¶ 4, at 1-2.  The Court calculated that, after the downward adjustment for acceptance of responsibility that the Motion requests and to which the Court agrees, "the offense level is 23 and the criminal history category is 4, providing a guideline imprisonment range of 70 to 87 months."  See Draft Transcript of Hearing at 13:7-11 (Court)(taken Sept. 20, 2018)("Tr.").  The Court entered an order granting the Motion and adjusting the offense level downward by one "additional level for acceptance of responsibility."  Sealed Order, filed March 8, 2019 (Doc. 94).

[6]PSR paragraphs 17, 26, and 39, are as follows:

    17.  **Base Offense Level:**  The guideline for a violation of 18 U.S.C. § 1791(a)(1) is USSG § 2P1.2.  Pursuant to the cross reference at § 2P1.2(c)(1), 2D1.1 is used to determine the offense level because it results in a higher offense level.  The base offense level is 26.  U.S.S.G. §§ 2D1.1A(a)(5) and 2P1.2(c)(1).

. . . .

    26.  **Total Offense Level: <u>23</u>**

. . . .

    39.  The total criminal history score is eight.  According to the sentencing

doses or units, based on "a statement from an unnamed FBI agent that each strip contained five (5) doses or units." Objections at 2 (citing PSR ¶ 10, at 4-5). Madrid contends that, at most, she admitted "prior to her arrest that she attempted to supply Chavez with two (2) strips." Objections at 2. Madrid states that the Chemical Analysis Report, on which Madrid contends courts usually rely to determine the quantity of controlled substance in a case, indicates that one strip contained no controlled substance, and the other contained buprenorphine residue only. See Objections at 2-3 (citing Chemical Analysis Report at 1). Madrid acknowledges that her Objection to the drug quantity determination does not affect her base offense level, which is 6 if calculated pursuant to U.S.S.G. § 2D1.1(c)(17), or 26, if calculated pursuant to U.S.S.G. § 2P1.2(c)(1). See Objections at 3.

Second, Madrid contends that the Court should apply a minor role reduction, pursuant to U.S.S.G. § 3B1.2(b), considering as evidence the Threatening Letters and Instructing Letters, the telephone calls during which Chavez instructed Madrid on how to smuggle the Suboxone, and the facts that "Chavez was the one who came up with the idea, told Ms. Madrid to do it, and told her how to do it." Objections at 3-4. Third, Madrid argues that "Madrid having a higher guideline range than her codefendant is an unwarranted disparity and therefore is an unjust result." Objections at 4. Madrid notes that Chavez' guideline range is lower than Madrid's, because Chavez "is not subject to the same cross reference," because of the United States' decision to

---

table in U.S.S.G. Chapter 5, Part A, a criminal history score of eight establishes a criminal history category of IV.
PSR ¶¶ 17, 26, 39, at 5-6, 11 (emphasis in PSR).

charge Chavez in violation of 18 U.S.C. § 1791(a)(2), which is for the attempt to possess contraband in prison. Objections at 4-5. Madrid contends this charging decision is unjust, "because the evidence supports that Chavez told Ms. Madrid to bring the suboxone to him, as well as instructed her on how to do so." Objections at 5. Madrid avers that, in the Tenth Circuit, district courts may consider and rectify codefendant sentencing disparity in the interests of justice. See Objections at 5. Madrid contends that, here, Chavez' base offense level is 13, pursuant to U.S.S.G. § 2P1.2, half of Madrid's, which is 26, and that the guidelines do not account "for the fact that he is charged with the same conspiracy to distribute or the fact that he instructed her on how to commit the *attempt to provide* portion of the statute." Objections at 5 (emphasis in Objections). Madrid notes that the PSR states a downward variance may be warranted in Madrid's case, because she "had a lesser role in the offense; however she has a higher guideline imprisonment range than the codefendant. The sentencing guidelines are more punitive towards the defendant as she was the one who attempted to provide the narcotic substance in a correctional facility." Objections at 5 (quoting PSR ¶ 96, at 21). Madrid proposes a downward variance to place Madrid at a base offense level of 13, with a 2-offense-level reduction for her minor role, and 2-offense-level reduction for her acceptance of responsibility, resulting in an adjusted offense level of 9 which, coupled with a criminal history category of IV, "would result in a guideline range of 12 to 18 months." Objections at 5. Madrid argues that one of her prior cases, "which results in three points and significantly enhances her criminal history category from a III to a IV," likewise resulted from her following Chavez' instructions, and then pleading guilty and taking

responsibility for her actions.  Objections at 6.

Fourth, Madrid contends that applying the cross-reference in U.S.S.G. § 2P1.2(c)(1) "has an unintended and unjust consequence in this case."  Objections at 6.  Madrid notes that the two counts against her were grouped, pursuant to U.S.S.G. § 3D1.2, because they involved substantially the same harm.  See Objections at 6 (citing PSR ¶ 16).  Madrid notes that, pursuant to U.S.S.G. § 3D1.3(a), the Guidelines require calculating the sentence range using the most serious count in the group, which also results in the highest offense level.  See Objections at 6 (citing U.S.S.G. § 3D1.3(a); PSR ¶ 17, at 5-6).  Madrid notes that Count 1 is "conspiracy to distribute Suboxone" in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and that Count 2 is "attempt to provide contraband in prison" in violation of 18 U.S.C. § 1971(a)(1).  Objections at 6-7.  Madrid notes that, regarding Count 2, where the object of distribution is a controlled substance, the Guidelines direct to apply U.S.S.G. § 2D1.1's analysis, and, if the resulting offense level is less than 26, to increase to level 26, pursuant to U.S.S.G. § 2P1.2(c)(1).  See Objections at 6-7.  Madrid contends that, calculating her range using Count 1 results in a base offense level of 6, pursuant to U.S.S.G. § 2D1.1(c)(17).  See Objections at 7.  Madrid contends that, with a 2-level enhancement for distribution in a detention facility, a 2-level reduction for acceptance of responsibility, and a criminal history category of IV, her guideline range would be 6 to 12 months.  See Objections at 7.  Madrid requests "that the Court consider the analysis in [United States v.]Cani," in which the Honorable Anne C. Conway, United States District Judge for the United States District Court for the Middle District of Florida, compared an inmate's Guidelines range

under U.S.S.G. § 2D1.1 and under U.S.S.G. § 2P1.2(c)(1), and, concluding that the "amount of heroin being distributed was minimal" and that "many of his crimes revolved around his own drug addiction," Judge Conway used the approach resulting in a lower guideline range to calculate the sentence for distribution of 0.10 grams of heroin to another inmate. See Objections at 7. Madrid contends that her case is like Cani's, in that she attempted to distribute an "extremely minimal amount of controlled substance," did so at Chavez' behest, and has a long, documented history of drug abuse. Objections at 7.

Finally, Madrid asks the Court to consider the Guidelines range as an 18 U.S.C. § 3553(a) factor. See Objections at 8 ("The Guideline range is itself a § 3553(a) factor."). Madrid contends that the "sentencing court must assess the statutory factors under 18 U.S.C. § 3553(a) without any presumption in favor of the advisory guideline sentence" and that the PSR's proposed guideline range is "unwarranted because the other relevant § 3553(a) factors strongly supports [sic] a lesser sentence." Objections at 9. Regarding her history and characteristics, Madrid contends that her last conviction was in 2010 and that, because of Chavez, her drug abuse "became a problem again and she began a downward spiral of bad decisions that led her to being sentenced in this very case." Objections at 9-10. Madrid requests that the Court "impose a sentence of six to twelve months imprisonment to be followed by a term of supervised release." Objections at 10.

### 2.    **The Addendum.**

The USPO responds to the Objections. See Addendum at 1-2. In the Addendum, the USPO first addresses Madrid's Objection to the PSR's description in paragraph 10 that this case involves

"10 doses or units of suboxone," PSR ¶ 10, at 4-5, when, at most, Madrid admitted before her arrest that she attempted to supply Chavez with two strips, and the Chemical Analysis Report states that one strip contained no controlled substance and the other contained only buprenorphine residue. See Addendum at 1. The USPO responds:

> **Response No. 1:** The lab report information is added to the presentence report by way of this Addendum. The case agent, Bryan Acee's statement will remain in the presentence report unless ordered removed by the Court. The summary paragraph of the offense conduct included the two suboxone strips. As the defendant admitted, the drug amount does not impact the base offense level.

Addendum at 1. Regarding Madrid's Objections to the PSR's paragraphs 11 and 20, that Madrid should receive a 2-level minor role reduction pursuant to U.S.S.G. § 3B1.2 based on the Threatening Letters and Instructing Letters, the USPO responds:

> **Response No. 2:** The information from the letters are added to the defendant's version of the offense by way of this Addendum. A minor role was considered based on the telephone calls indicating she received some direction from the co-defendant Christopher Chavez and she also stated he pressured her to commit the offense. However, the defendant played a significant role in the offense. The defendant was the one who purchased the suboxone and provided it to the attorney for delivery. She was also supposed to receive compensation for supplying the suboxone. Further, the telephone calls indicate the defendant was involved in distributing suboxone strips to inmates on multiple occasions. Therefore, the defendant was not assessed to have a minor role.

Addendum at 2.

### 3. The Response.

The United States filed a response. See United States' *Ex Parte* Response to Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed September 18, 2018 (Doc. 65)("Response"). In the Response, the United States argues that the 18 U.S.C. § 3553(a)

factors counsel the Court to sentence Madrid within the Guidelines sentencing range and not to vary downward.  <u>See</u> Response at 1-2.  The United States first addresses Madrid's request for a minor role reduction.  <u>See</u> Response at 3.

The United States argues that, where Madrid herself "obtained the drugs, put them in a card, and gave them to another person to take into the facility," she is not a minor participant in the offense.  Response at 3.  The United States cites to <u>United States v. Guerra-Solis</u>, No. CR 14-3428 JB, 2015 WL 13658625 (D.N.M. Aug. 8, 2015)(Browning, J.), in which the Court determined that, in deciding whether a defendant is a minor participant in an offense, the inquiry must "focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense."  Response at 3 (citing <u>United States v. Guerra-Solis</u>, 2015 WL 13658625, at *1).  The United States points to <u>United States v. Salazar-Samaniega</u>, 361 F.3d 1271, 1277 (10th Cir. 2004), for the same proposition.  <u>See</u> Response at 3.  The United States contends that, to receive a minor role reduction, Madrid has the burden to prove by a preponderance of the evidence that she is "less culpable than most other participants."  Response at 3 (citing <u>United States v. Guerra-Solis</u>, 2015 WL 13658625, at *1).

The United States next addresses Madrid's request for a downward variance, to correct the disparity between her base offense level and Chavez' base offense level.  <u>See</u> Response at 3-4.  The United States contends that the facts justify the charging disparity, where Chavez "was never in actual possession of the prohibited items," and where Madrid "*provided and attempted to provide* the prohibited item for introduction into the facility."  Response at 4 (emphasis in

Response).  Last, the United States contends that the Court should not vary downward from the advisory Guidelines imprisonment range, because the 18 U.S.C. § 3553(a) factors counsel an in-range sentence.  <u>See</u> Response at 4.  The United States contends that a sentence within the guidelines range "will further the important and intrinsically valuable end of ensuring uniformity." Response at 4.  The United States also contends that Madrid's lengthy and varied criminal history warrants an in-range sentence.  <u>See</u> Response at 4-5.  The United States requests that the Court sentence Madrid "within the Guidelines' 70 to 87 month imprisonment range, to a low-end sentence of 70 months."  Response at 5.

### 4. **The Hearing.**

The Court began the hearing by asking whether Madrid reviewed the PSR and Addendum with her counsel, and Madrid replied that she had an Objection regarding the amount-of-drugs calculation, and an Objection regarding the lack of a minor role adjustment.  <u>See</u> Draft Transcript of Motion Proceedings at 2:14-19 (taken September 20, 2018)(Court, Henderson)("Tr.").[7]  The Court then asked whether Madrid's and the USPO's stated positions, in the Objections and Addendum, took care of the amount-of-drugs calculation Objection or if the parties wanted an evidentiary hearing -- even though sustaining the Objection would not affect the guidelines calculation.  <u>See</u> Tr. at 2:19-24 (Court).  Madrid answered that the fact that both positions were noted sufficiently takes care of the Objection.  <u>See</u> Tr. at 2:25-3:1 (Henderson).  The Court turned

---

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

to the remaining Objection, regarding the minor role adjustment.  See Tr. at 3:3-4 (Court).  Madrid began by acknowledging the argument, based on the fact that she was the one who obtained the Suboxone and attempted to provide it to an inmate in jail, that she played an essential role in the offense.  See Tr. at 3:16-19 (Henderson).  Madrid emphasized, however, that she took all her actions "at the direction of the co-defendant, Chris Chavez," and she indicated that the Threatening Letters and Instructing Letters -- containing information not included in the PSR -- highlight that Chavez told Madrid to perform the actions which constituted her role in the offense, and that he threatened her to compel her to perform them.  Tr. at 3:21-22 (Henderson).  See id. at 3:21-4:25 (Henderson).  Madrid noted that even the telephone calls between Madrid and Chavez, that the PSR's ¶ 8, at 4, describes, reveal that Chavez threatened and instructed Madrid throughout the offense's commission.  See Tr. at 5:9-13 (Henderson).  The United States responded that Chavez' threats were not viable "as to what he can do personally," when Chavez was in jail and Madrid was not.  Tr. at 6:12-14 (Armijo).  The United States suggested Madrid could have ignored Chavez' threats, but that, instead, Madrid played an essential role in an "elaborate scheme."  Tr. at 6:14-18 (Armijo).  The United States emphasized that, although Chavez instructed and threatened Madrid, she followed his instructions "where there was no gun pointed to her head" and participated in a scheme that involved using Mr. Mondragon to bring Suboxone into the jail.  Tr. at 7:9-14 (Armijo).  The Court asked which other players, apart from Madrid and Chavez, were charged in the conspiracy to provide Suboxone to inmates.  See Tr. at 7:16-20 (Court).  The United States responded that no others were charged, but that the United States believes Chavez intended to use

the Suboxone in jail to "gain favor with the SNM." Tr. at 7:21-23 (Armijo). The Court asked if and how Madrid would have received compensation for supplying the Suboxone. See Tr. at 8:18-9:2 (Court). The United States responded that "what is commonly done in these types of cases is that" Chavez could give Suboxone to another inmate and then instruct that inmate to have his wife, outside of jail, pay Madrid for the Suboxone. Tr. at 9:3-14 (Armijo). Madrid noted that PSR ¶ 10, at 4-5, holds Madrid accountable for supplying ten units of Suboxone and that the Chemical Analysis Report revealed only "residue of the underlying drug that is related to Suboxone." Tr. at 11:1-9 (Henderson).

The Court stated that it seemed to the Court that, because of her decision to participate in an elaborate scheme involving Mr. Mondragon, a Court-appointed attorney, Madrid played an essential role, even though she was under pressure from Chavez, who was in jail. See Tr. at 11:10-12:2 (Court). The Court stated that Madrid "is the person that committed the crime here." Tr. at 12:7-8 (Court). The Court confirmed that it had reviewed the Threatening Letters and the Instructing Letters but concluded that, if Madrid had "told him no, there wouldn't be this" crime. Tr. at 12:11-12 (Court). The Court also noted that the telephone records suggest "this wasn't her first time to do this." Tr. at 12:16-17 (Court). The Court denied the request for a minor role adjustment. See Tr. at 12:22-23 (Court).

The Court next asked whether the United States moved for an adjustment downward "for acceptance of responsibility," and the United States confirmed that it would file the United States' Sealed Motion for Downward Adjustment in Defendant's Offense Level, filed September 28, 2018

(Doc. 69)("Motion") after the hearing. Tr. at 12:23-13:3 (Court, Armijo). Madrid, in response to the Court's question, raised no objection. See Tr. at 13:4-6 (Court, Henderson). The Court calculated that, after the downward adjustment for acceptance of responsibility that the Motion requests and that the Court agreed to, "the offense level is 23 and the criminal history category is IV, providing a guideline imprisonment range of 70 to 87 months." Tr. at 13:7-11 (Court). Madrid next suggested that the Court "consider two separate downward variances in this case," to correct "an unwarranted disparity" between Madrid's advisory Guidelines range and Chavez' range. Tr. at 13:16-25 (Henderson). Madrid contended that, although both Madrid and Chavez were "charged with the same conspiracy to distribute," because of a cross-reference in the Guidelines, Madrid's range is higher, because the Indictment charges her with providing rather than possessing contraband. Tr. at 14:1-6 (Henderson). Madrid cited to United States v. Smart, 518 F.3d 800 (10th Cir. 2008), in which the United States Court of Appeals for the Tenth Circuit held "that it is clear that a co-defendant disparity is not a per se improper factor such that this is a consideration that would constitute procedural error." Tr. at 14:8-12 (Henderson). Madrid noted that the Tenth Circuit "stated that a district court may also properly account for unwarranted disparities between co-defendants who are similarly situated and that the district court may compare defendants" when deciding sentences. Tr. at 14:12-16 (Henderson). Madrid assumed Chavez' base offense level "would be a 13," pursuant to U.S.S.G. § P1.2, "half of the base offense level of 26 for Ms. Madrid." Tr. at 14:17-21 (Henderson). Madrid noted that PSR ¶ 96, at 21, states:

> The defendant had a lesser role in the offense, however, she has a higher
> guideline imprisonment range than the codefendant. The sentencing guidelines are

more punitive towards the defendant as she was the one who attempted to provide the narcotic substance in a correctional facility. They both have lengthy criminal histories.

PSR ¶ 96, at 21. Madrid notes that the PSR acknowledges that a variance might be appropriate in this case, given Madrid's lesser role and the Guidelines' automatic enhancement for provide/attempt to provide crimes, with no enhancement for possess/attempt to possess crimes. See Tr. at 15:1-6 (Henderson). Madrid averred that:

> If a downward variance were to occur, assuming that there is downward pressure of 13 offense levels to take her to the same base offense level of Mr. Chavez, and a reduction for acceptance, that would significantly lower her adjusted offense level in this case and would be more appropriate in this matter.

See Tr. at 15:6-19 (Henderson). Regarding Madrid's second variance request, Madrid objected to the application of the cross-reference in U.S.S.G. § 2P1.2(c)(1). See Tr. at 16:4-7 (Henderson). Madrid contends that her base offense level should be 6, but that the cross-reference elevates it unjustly to 26, and Madrid suggested that other cases have declined to apply the cross-reference where its application would produce an unjust result, disproportionate with the crime. See Tr. at 17:1-25 (Henderson). Madrid contends that, without the cross-reference's application, Madrid's guideline range would be 6 to 12 months. See Tr. at 18:1-2 (Henderson).

Regarding her criminal history, Madrid averred that she has stayed out of trouble for many years, her last conviction being in 2010, and that many of her early convictions stemmed from her battle with opiate addiction and her involvement with Chavez. See Tr. at 18:1-13 (Henderson). Madrid also drew the Court's attention to the Certificates, which Madrid contended demonstrate that she "has been going to multiple classes about drug addiction, about parenting," and about

other topics, trying to get her life back on track. Tr. at 18:14-20 (Henderson). Madrid contends that she understands now "that her relationship with the co-Defendant in this case is toxic and that she needs to remain clean" to be able "to move forward." Tr. at 18:21-25 (Henderson). Madrid requested a sentence between 6 to 12 months and stated her amenability to attend inpatient rehabilitation. See Tr. at 19:1-7 (Henderson).

The United States asked the Court for a sentence at the low end of the Guidelines range. See Tr. at 20:5-6 (Armijo). Regarding Madrid's argument that the Court should eliminate the variance between her sentence and Chavez' sentence, the United States noted that Chavez "can't possess it unless she provided it. So there is a significant difference in the role they played. She obtained it. She put it in the Christmas cards," and she "went through the elaborate scheme of giving it to defense counsel and putting that person in a precarious situation." Tr. at 20:9-14 (Armijo). The United States contends that the Guidelines recognize the difference between a possessor's or recipient's role in a drug distribution offense, and a provider's role, and that the Guidelines intentionally create variance between the sentences imposed for each role. See Tr. at 20:14-18 (Armijo). The United States contends that Madrid's higher Guideline range is logical given that the United States' position is that Suboxone "would have been used to further the racketeering activities of the SNM" and that Madrid attempted to provide more than one dose of the drug. Tr. at 20:25-21:3 (Armijo).

The United States further emphasized that Madrid "had an opportunity in this case to prove herself." Tr. at 21:15-19 (Armijo). The United States argued that it and the USPO "let her out of

custody and pretrial gave her numerous opportunities as reflected in the presentence report for two different types of drug treatment and the[n] she kept on testing positive." Tr. at 21:19-23 (Armijo). The United States contended that, "after there was a warrant for her arrest," Madrid "didn't immediately turn herself in." Tr. at 21:23-25 (Armijo).

The Court adopted the PSR's factual findings and the Addendum added Madrid's arguments about the drug amount; the Court thus stated that it thinks "that resolves any factual dispute." Tr. at 22:10-14 (Court). The Court overruled Madrid's Objection to the lack of a minor role adjustment. See Tr. at 22:15-18 (Court). Considering the PSR's Guidelines application, the Court determined Madrid's offense level to be 23, her criminal history category to be IV, and the advisory Guidelines imprisonment range to be 70 to 87 months. See Tr. at 22:21-23 (Court). Court also considered the 18 U.S.C. § 3553(a)(1) through (7) factors. See Tr. at 22:19 (Court). The Court emphasized that Madrid "presents a complex picture" and that the Court "carefully considered the Guidelines," but in arriving at the sentence, took "into account not only the Guidelines but other sentencing goals." Tr. at 22:24-23:3 (Court). The Court recognized that Madrid "was under pressure" and that pressuring women like Madrid to smuggle drugs into prison is a known SNM activity. Tr. at 23:10-15 (Court). The Court also recognized that Madrid accepted responsibility for the offense. See Tr. at 24:1-2 (Court). The Court emphasized, however, a number of factors "that continue to put upward pressure" on the sentence "to keep it up in the Guideline range." Tr. at 24:4-6 (Court).

First, the Court noted the crime's seriousness and that SNM members could not have gotten

drugs into prisons had persons like Madrid not introduced those drugs, contributing to gang racketeering activity and crime in prisons. See Tr. at 24:8-15 (Court). The Court noted no Kimbrough v. United States, 552 U.S. 85 (2007)("Kimbrough"), disagreement with the Guidelines or the cross-reference. See Tr. at 25:6-7 (Court). The Court also noted that, despite the considerable opportunities which the USPO provided Madrid, she did not perform well on pretrial supervision. See Tr. at 25:13-17 (Court). The Court concluded that Madrid, although entitled to some variance, is not entitled to the variance Madrid requests, given the factors putting upward pressure on the sentence. See Tr. at 26:1-4 (Court). The Court varied the equivalent of one offense level, to arrive at a working range of 63 to 78 months, and sentenced Madrid at the low end of that range. See Tr. at 26:11-19 (Court). The Court sentenced Madrid outside the applicable Guideline range, after considering the 18 U.S.C. § 3553(a)(1) through (7) factors. See Tr. at 26:23-27:2 (Court). The Court considered the offense's nature and circumstances, Madrid's history and characteristics, the need to avoid unwarranted sentencing disparity among similarly situated defendants, that Chavez pressured Madrid, that the offense involved a small quantity of drugs, and that no acts of violence were involved. See Tr. at 27:1-15 (Court). The Court also considered Madrid's expressed interest in counseling to overcome her drug addiction, her completion of substance abuse programs and the Certificates. See Tr. at 27:19-23 (Court). On the other hand, the Court noted Madrid's lengthy criminal history involving violent offenses -- although the Court noted her last offense was in 2010 -- and her history of supervision violations and mental health problems. See Tr. at 28:1-5 (Court). The Court sentenced Madrid to 63 months, below the

advisory Guidelines range, but within the Court's working Guidelines range of 63 to 78 months after a variance equal to one offense level. <u>See</u> Tr. at 29:1-6 (Court). The Court noted that the sentence is "not a Guideline sentence," but that the Court believed it had worked hard to justify the sentence, and that it would "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Tr. at 29:12-16 (Court).

The Court committed Madrid to the Bureau of Prisons' custody for a term of 63 months, to run concurrently, and recommended that she participate in the Bureau of Prisons' 500-hour drug and alcohol treatment program. <u>See</u> Tr. at 30:4-8 (Court). The Court placed Madrid on supervised release for a term of three years, commencing after her Bureau of Prisons sentence's completion. <u>See</u> Tr. at 30:8-11 (Court). The Court stated that Madrid "must comply with the mandatory and standard conditions," and imposed special conditions. <u>See</u> Tr. at 30:11-13 (Court). The Court required Madrid, because the offense involved a narcotic drug, and because of Madrid's history of drug abuse and mental health problems, to: (i) "participate in an out patient substance abuse treatment program"; (ii) waive her confidentiality rights as to her treatment records; (iii) submit to substance abuse testing; (iv) submit to a search of her persons, property, vehicles, papers, and computers, for the purpose of detecting alcohol, drugs, or illegal contraband, when reasonable suspicion exists and the search is conducted in a reasonable manner at a reasonable time; (v) inform any residence or occupants that the residence may be subject to a search; and (vi) avoid using or possessing narcotic drugs. Tr. at 30:15-32:24 (Court). The Court also stated that Madrid may not communicate or interact with co-defendants or coconspirators, to help her avoid committing future

crimes, and that she must complete fifty hours of community service.  See Tr. at 33:5-10 (Court).

The Court noted that, based on Madrid's lack of financial resources, "the Court will not impose a

fine or a portion of a fine."  Tr. at 33:15-17 (Court).  The Court informed Madrid of her appeal

rights.  See Tr. at 34:16-35:5 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States

of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-

473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising

the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact,

including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors

that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past,

in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18

U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective
> manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United

States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).    A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a).   See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."   United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).   This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.   See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough, 552 U.S. at 90-91; Rita v. United States, 551 U.S. at 351.   Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[8] Guidelines

_____

[8]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.   Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . .");   United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").   The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").   The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.   See

United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

       The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

     . . . .

       The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20,

sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47;

Kimbrough, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13,

2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is "in a

superior position to find facts and judge their import under § 3553(a) in each particular case."

Kimbrough, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has concluded that the case

of an illegal immigrant who re-entered the United States to provide for his two children and two

siblings was not materially differentiated from other re-entry cases, and, thus, no variance from

the Guidelines sentence was warranted.  See United States v. Almendares-Soto, No. CR 10-1922

JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in United

States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.),

although the defendant's military service was not present to an unusual degree and, thus, did not

warrant a departure, the Court concluded that a variance was appropriate, because the defendant's

2014)(Browning, J.)(emphasis in original).

military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING MINOR ROLE ADJUSTMENT

Section 3B1.2 provides for a 2- to 4-level downward adjustment of a criminal defendant's offense level if the criminal was a "minor" or "minimal" participant in the crime for which he or she is being sentenced. U.S.S.G. § 3B1.2. The Tenth Circuit has determined that this downward adjustment is in the district court's discretion and should be granted only if the court finds that the defendant is less culpable than the other participants in the particular offense. See United States v. Santistevan, 39 F.3d 250, 254 (10th Cir. 1994). It is the defendant's burden to prove, by a preponderance of the evidence, that he was a minor participant. See United States v. Mendez, 272 F. App'x 703, 705 (10th Cir. 2008)(citing United States v. James, 157 F.3d 1218, 1219 (10th Cir. 1998)).

The commentary to the Guidelines, which is authoritative unless it conflicts with federal law, states that the 4-level decrease for "minimal" participation will be used infrequently and should be reserved for "defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. 4. The 2-level decrease for "minor" participation applies to individuals who are "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. 5. Finally, the Guidelines permit a 3-level decrease for an individual whose culpability is somewhere between that of either a minimal or a minor participant. See United States v. Santistevan, 39 F.3d at 254 (internal citations and quotes omitted).

The Tenth Circuit has repeatedly addressed the situation in which a drug courier requests a downward adjustment of offense level based on U.S.S.G. § 3B1.2. See, e.g., United States v. Martinez, 512 F.3d 1268, 1276 (10th Cir. 2008); United States v. Rangel-Arreola, 991 F.2d 1519, 1524 (10th Cir. 1993); United States v. Arredondo-Santos, 911 F.2d 424, 426 (10th Cir. 1990); United States v. Calderon-Porras, 911 F.2d 421, 423 (10th Cir. 1990). The Tenth Circuit has consistently held that a defendant being a courier does not, ipso facto, render him or her a minor participant:

> [W]e have consistently refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier. We explained, [d]rug couriers are an indispensable component of drug dealing networks. To debate whether couriers as a group are less culpable would [be] akin to the old argument over which leg of a three-legged stool is the most important leg.

United States v. Martinez, 512 F.3d at 1276 (internal quotes and citations omitted). Courts must therefore make a fact-intensive inquiry whether the courier was, for reasons other than his or her mere status as a courier, a minor or minimal participant in the relevant crimes.

## ANALYSIS

The Court sustains Madrid's Objections in part and overrules them in part. The Court sustains Madrid's Objection to the last sentence of paragraph 10 of the PSR, because Suboxone quantity is typically determined based on the drug-weight equivalent of the number of units of Suboxone, and no reliable case-specific information indicates how many doses of Suboxone are on a strip of Suboxone or how many doses of Suboxone constitute a single unit of Suboxone, and such information is needed to convert doses into a weight equivalent using the U.S.S.G. drug quantity tables in § 2D1.1. The Court overrules Madrid's Objections to her base level offense

calculation, because U.S.S.G. § 2P1.2(c)(1) applies, and concludes that Madrid's offense level is 23, her criminal history category is IV, and the advisory Guidelines imprisonment range is 70 to 87 months. Considering the 18 U.S.C. § 3553(a) factors, the Court varies downward by the equivalent of 1 level, arriving at a working range of 63 to 78 months, and the Court sentences Madrid at the low end of that working range, committing Madrid to the custody of the Bureau of Prisons for a term of 63 months to run concurrently, followed by a three-year term of supervised release.

I.     **THE COURT SUSTAINS MADRID'S OBJECTION TO PARAGRAPH 10 OF THE PSR, ATTRIBUTING TO HER TEN DOSES OF SUBOXONE BASED ON AN ANONYMOUS FBI AGENT'S PROFFER.**

On June 1, 2018, Madrid pled guilty to violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(E), 846, and 21 U.S.C. §§ 841(b)(1)(E), 846, "Conspiracy to Distribute Suboxone," and a violation of 18 U.S.C. § 1791(a)(1), "Attempt to Provide Contraband in Prison." PSR ¶ 2, at 3. Madrid objects to the PSR's paragraph 10, which states in relevant part:

> According to the FBI agent, each suboxone strip involved in the instant offense had a value of approximately $100 inside a jail/prison and indicated each strip contained five doses or units which could be sold for approximately $20 per dose/unit. Consequently, Madrid . . . [is] accountable for 10 doses or units of Suboxone.

PSR ¶ 10, at 4-5. Madrid specifically objects to the last sentence of the PSR's paragraph 10, holding her accountable for ten doses or units of Suboxone, because, Madrid contends, the agent's statement should not be evidence in this case. See Objections at 3. Madrid contends that, instead, the Court should "rely on the chemical laboratory reports, which it normally does to determine the quantity of controlled substance in a case." Objections at 2-3. The United States submits no

response.  The USPO counters that the drug amount does not affect Madrid's base offense level and that Acee's statement "will remain in the presentence report unless ordered removed by the Court."  Addendum at 1.  The USPO also notes that the "summary paragraph of the offense conduct included the two suboxone strips."  Addendum at 1 (citing PSR ¶ 11, at 5).

Section 2D1.1(D) provides that 1 unit of a Schedule III substance is equal to a converted drug weight of 1 gram of marijuana.  <u>See</u> U.S.S.G. § 2D1.1(D).  Note F to the Drug Quantity Table states that, for Schedule III substances, 1 unit "means one pill, capsule, or tablet." U.S.S.G. § 2D1.1(C) note F.  The federal sentencing guidelines do not determine how many sublingual Suboxone strips constitute a single unit of a Schedule III substance, nor do they permit calculating Suboxone quantity by dose rather than unit.  <u>See</u> U.S.S.G. § 2D1.1(C) note F.  When lawfully prescribed, a single Suboxone strip serves a single use for one patient.  <u>See</u>, <u>e.g.</u>, <u>Buprenorphine with Naloxone (Suboxone Sublingual Film) for Opiate Dependence</u>, Radar, NPS Medicinewise, https://www.nps.org.au/radar/articles/buprenorphine-with-naloxone-Suboxone-sublingual-film-for-opiate-dependence (last visited Dec. 15, 2018)("Radar").  A single Suboxone strip, however, may not have the same effect as a single Suboxone tablet.  <u>See</u> Radar ("The bioavailability . . . of buprenorphine is about 20% greater for buprenorphine with naloxone 8mg/2mg sublingual film than for the corresponding tablets, but this may not be clinically important for many patients.").  Therefore, analogizing strips to tablets and determining that a single strip constitutes a single unit may not be accurate.

When Suboxone strips are smuggled into prisons, the smuggling inmate's whim determines

the number of doses derived from a single strip of Suboxone.  See, e.g., Daniel Genis, This Anti-Heroin Drug is Now King of the Jailhouse Drug Trade, Daily Beast (July 17, 2014) https://www.thedailybeast.com/this-anti-heroin-drug-is-now-king-of-the-jailhouse-drug-trade (stating that, in the author's experience, when a Suboxone strip reaches a prison, "it is cut up into eight doses.  Or 10 if the dealer is greedy."); Collin A. Young, Inmates Warn About Suboxone Use in Jail, Salem News (Aug. 16, 2018), https://www.salemnews.com/news/state_news/inmates-warn-about-suboxone-use-in-jail/article_39de3b9b-371a-5a85-840c-1b8bae5ca5e8.html (quoting an inmate in Massachusetts, who stated: "An eight-milligram Suboxone strip can be cut into sixteenths . . . .").  Acee contends that each Suboxone strip which Madrid attempted to provide contains five doses or units.  See PSR ¶ 10, at 5.[9]  Presumably, Acee assumes the Suboxone strips are cut up and distributed to multiple inmates -- however, Acee does not explain his assumption that each strip that Madrid sought to provide would be cut into five pieces rather than two or sixteen pieces.  Sentencing two Suboxone smugglers differently, because one delivered a strip that would be cut only in half while the other delivered a strip that would be cut into sixteenths would result in large sentencing disparities for the same quantity of narcotic, contrary to Congress' attempt to "provide a logical sentencing structure for drug offenses."  U.S.S.G. § 2D1.1 note 27.[10]

---

[9]The definition of "unit," in U.S.S.G. § 2D1.1(C) note F, does not create an equivalence between doses and units, and does not suggest that a single dose equals a single unit for sentencing purposes.

[10]The Supreme Court has stated that, to avoid sentencing disparities, in 1984, "Congress amended the narcotics laws . . . to calculate penalties by the weight of the pure drug involved." Neal v. United States, 516 U.S. 284, 288 (1996).  The Supreme Court stated: "Focusing on the

Smuggling inmates may cut up Suboxone pills in prisons and distribute a single pill in multiple doses to multiple inmates -- yet, for the Guidelines' purposes, the inmate will be held accountable for the number of pills distributed -- not the number of doses. See U.S.S.G. § 2D1.1(D). See Dailey v. United States, Nos. 2:14-CR-96-JRG-MCLC-1, 2:16-CV-163-JRG, 2017 WL 2124095, at *2 (E.D. Tenn. May 15, 2017)(Greer, J.)(stating that the USPO deemed the petitioner "responsible for 124 units of Suboxone," where 1 pill equaled 1 unit, and the USPO then converted units to drug weight, arriving at a marijuana equivalent and a base offense level based on the marijuana equivalent).

Suboxone strips pose a sentencing quandary which Congress has yet to rectify. Sentencing Suboxone strip possession or distribution by dose results in unwanted sentencing disparities depending on whether a Suboxone smuggler's customer elects to cut Suboxone strips into few or many pieces. If, for example, the difference in buprenorphine availability between the two forms of Suboxone is important, determining that a single Suboxone strip equals a single Suboxone tablet for sentencing purposes may create sentencing disparities among individuals charged with possessing the same narcotic, albeit in different forms. See Radar ("The bioavailability . . . of buprenorphine is about 20% greater for buprenorphine with naloxone 8mg/2mg sublingual film

---

pure drug, however, often allowed retail traffickers, who supplied street markets with mixed or diluted drugs ready for consumption, to receive sentences lighter than what Congress deemed necessary." Neal v. United States, 516 U.S. at 288-89. The Supreme Court stated that, in 1986, therefore, Congress adopted a new approach "under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." Chapman v. United States, 500 U.S. 453, 460 (1991).

than for the corresponding tablets . . . .").  In 2010, the United States Food and Drug Administration ("FDA") approved a 2 milligram and an 8 milligram version of a Suboxone strip. Application Number: 022410Orig1s000 Summary Review at 3, Center for Drug Evaluation and Research, Food and Drug Administration (Aug. 30, 2010).  Federal courts generally do not, however, indicate in their decisions, in referring to particular Suboxone strips, whether the strips are two milligrams or eight milligrams.  See, e.g., United States v. Cureton, 661 F. App'x 369, 372 (6th Cir. 2016)(referring to "four Suboxone strips"); United States v. Young, Crim. No. ELH-13-151 (#25), 2018 WL 1426501, at *10 (D. Md. March 22, 2018)(Hollander, J.)(referring to "fewer than ten Suboxone strips."). Ausherman v. W.V.C.F., No. 2:17-cv-00211-WTL-MJD, 2017 WL 3980571, at *1 (S.D. Ind. Sept. 11, 2017)(Lawrence, J.)(referring to "190 Suboxone strips").  It might make sense to determine Suboxone quantity in strip form by the milligrams of Suboxone contained in each strip at issue.  Congress, however, has not spoken on the issue, and the PSR does not contain that information.  The Court agrees with Madrid, nevertheless, that Acee's determination that each Suboxone strip would be cut into five doses and that Madrid, therefore, should be accountable for ten doses of Suboxone, is arbitrary, and the Court may not rely upon that assertion.  Although Congress has not clarified, for sentencing purposes, how courts should determine Suboxone quantity when in strip form, the Court concludes that Congress cannot have intended that Suboxone quantity determinations turn on into how many pieces a particular inmate cuts a Suboxone strip.

The Court notes that striking paragraph 10's last sentence does not affect the PSR's calculation of Madrid's base offense level as 26. See PSR ¶ 17, at 5-6. Madrid admits the drug amount does not impact her base offense level. See Objections at 2. The USPO agrees that the drug amount does not impact Madrid's base offense level. See Addendum at 1. The USPO has added the Chemical Analysis Report to the PSR by way of the Addendum, notes that the PSR's ¶ 11 includes reference to two Suboxone strips, and states that Acee's "statement will remain in the presentence report unless ordered removed by the Court." Addendum at 1. The Court began the hearing by asking whether Madrid's and the USPO's stated positions, in the Objections and Addendum, took care of the amount-of-drugs calculation Objection or if the parties wanted an evidentiary hearing -- even though sustaining the Objection would not affect the guidelines calculation. See Tr. at 2:19-24 (Court). Madrid answered that the fact that both positions were noted sufficiently takes care of the Objection. See Tr. at 2:25-3:1 (Henderson). The Court did not consider Acee's testimony in its sentencing determination and strikes Acee's testimony from the PSR.

## II.    THE COURT DENIES MADRID'S REQUEST THAT THE COURT, PURSUANT TO U.S.S.G. § 3B1.2(b), APPLY A MINOR ROLE REDUCTION TO HER SENTENCE.

The Court will not grant a minor-participant role adjustment. Section 3B.12(b) provides that, if a defendant "was a minor participant in any criminal activity," their offense level should decrease by 2 levels. U.S.S.G. § 3B1.2(b). Application Note 3 states that, for this adjustment to apply, the defendant must play "a part in committing the offense that makes him substantially less

culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. 3(A).[11]  The

Tenth Circuit has concluded that knowledge is a permissible factor in the minor-participant

---

[11]On April 9, 2015, the United States Sentencing Commission (the "Commission") voted to promulgate amendments to some portions of the United States Sentencing Guidelines ("U.S.S.G."). See National Sentencing Resource Counsel Project, Federal Public & Community Defenders, Summary of 2015 Proposed Amendments to the Sentencing Guidelines 1 (2015), available at https://goo.gl/8BjPUi.  The Commission submitted the amendments to Congress on April 30, 2015, pursuant to its authority under 28 U.S.C. § 994(p).  The amendments went into effect on November 1, 2015.  The Commission made some several changes to § 3B1.2.

First, the Commission addressed a circuit split on the meaning of "average participant," adopting the approach of the United States Courts of Appeals for the Seventh Circuit and for the Ninth Circuit, which define "average participant" as those persons who actually participated in the criminal activity at issue in the defendant's case, so that the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand. See, e.g., United States v. Benitez, 34 F.3d 1489, 1498 (9th Cir. 1994); United States v. DePriest, 6 F.3d 1201, 1214 (7th Cir. 1993).  The Commission rejected the approach of the United States Courts of Appeals for the First Circuit and for the Second Circuit, which have concluded that the "average participant" also includes "the universe of persons participating in similar crimes."  United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004); see also United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999).  "Under this latter approach, courts w[ould] usually consider the defendant's culpability relative both to his co-participants and to the typical offender."  United States Sentencing Commission, Amendments to the Sentencing Guidelines 45 (2015).  The amendment revises the commentary to specify that, when determining the mitigating role, the defendant is to be compared with the other participants "in the criminal activity."  See U.S.S.G. § 3B1.2 cmt. 3(A) ("This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity.").

Second, the amendment provides a non-exhaustive list of factors for the court to consider in determining whether to apply a mitigating role adjustment under § 3B1.2 and, if so, the amount of the adjustment.  See United States Sentencing Commission, Amendments to the Sentencing Guidelines 46 (2015).  Commentary note 3(C) now states:

Fact-Based Determination. -- The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case.

analysis and that, if a defendant has knowledge or understanding of, for example, a drug enterprise, the Court may permissibly consider that knowledge in determining whether the defendant was a minimal or minor participant in the criminal activity. See United States v. Valdea-Perea, 597 F. App'x 1000, 1007 (10th Cir. 2015)(unpublished).[12] See also United States v. Lockhart, 37 F.3d

---

In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts of the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)     the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. 3(C).

Third, the commentary now states that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline" and "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." U.S.S.G. § 3B1.2, cmt. 3(C). Finally, "the commentary discussing individuals who perform limited functions has been changed to state that they 'may receive' a mitigating role adjustment rather than that they 'are not precluded' from receiving an adjustment." See National Sentencing Resource Counsel Project, Federal Public & Community Defenders, supra, at 2 (discussing U.S.S.G. § 3B1.2 cmt. 3(A)).

[12]United States v. Valdea-Perea is an unpublished opinion, but the Court can rely on an unpublished opinion of the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be

1451, 1455 (10th Cir. 1994)(noting that the PSR revealed that the defendant had "knowledge or understanding" of the drug enterprise, and that he was thus "not a minimal or minor participant.").

Madrid contends that, based on the PSR's evidence, she qualifies for a "mitigating role adjustment . . . as a minor participant, as the evidence supports that Chavez told her to bring the suboxone to him, as well as instructed her on how to do so." Objections at 4. Madrid argues, based on the Threatening Letters, that Chavez' threats induced her to participate in the Suboxone distribution scheme, and that Chavez "came up with the idea, told Ms. Madrid to do it, and told her how to do it." Objections at 4. The USPO responded that, although it considered applying a minor role adjustment based on its awareness that Chavez directed and pressured Madrid, the USPO noted that Madrid played an essential role when she purchased the Suboxone, provided it to Mr. Mondragon for delivery, and expected to receive compensation for the delivery, and that the telephone calls between Madrid and Chavez suggest Madrid had distributed Suboxone to inmates on more than one occasion. See Addendum at 2. At the hearing, the Court noted the Threatening Letters and Instructing Letters, and acknowledged that Chavez placed pressure on

_____

cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Moreno, 696 F. App'x 886 (10th Cir. 2017), United States v. Valdea-Perea, 597 F. App'x 1000 (10th Cir. 2015), United States v. Chavez-Torres, 359 F. App'x 75 (10th Cir. 2010), United States v. Mendez, 272 F. App'x 703 (10th Cir. 2008), and United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008), have persuasive value with respect to material issues and will assist the Court in its disposition of this Memorandum Opinion and Order.

Madrid, but the Court concluded that Madrid played an essential role in the offense.  See Tr. at 12:22-23 (Court).

Madrid does not deny that she had knowledge and understanding of the drug enterprise -- she does not argue that she unwittingly smuggled drugs.  See United States v. Valdea-Perea, 597 F. App'x at 1007.  The Tenth Circuit has stated that the minor-participant inquiry must "focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense."  United States v. Calderon-Porras, 911 F.2d 421, 423-24 (10th Cir. 1990).  See United States v. Salazar-Samaniega, 361 F.3d 1271, 1277 (10th Cir. 2004).  In the Instructing Letters, Chavez writes, "remember I could get more in there in there [sic] actual form," referring to the Suboxone.  Instructing Letters at 3.  Madrid does not deny that she knew Chavez intended to sell the Suboxone within the prison and that, pursuant to Chavez' instructions, she knew how he would receive the Suboxone -- through her efforts.

Although Madrid suggests that she was merely an unwilling mule or courier, the Tenth Circuit has not found defendants automatically to qualify for minor-role adjustments based only on their courier status.  See, e.g., United States v. Mendez, 272 F. App'x 703, 705 (10th Cir. 2008)(unpublished)("Even if Mendez was simply a courier, however, this does not mean he automatically qualifies for a minor role adjustment.");  United States v. Martinez, 512 F.3d at 1276 ("[W]e have consistently refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier. . . . [D]rug couriers are an indispensable component of drug dealing networks.").  To receive the adjustment, the defendant has "the burden

to prove by a preponderance of the evidence" that he or she was "less culpable than most other participants." United States v. Ballard, 16 F.3d 1110, 1114-15 (10th Cir. 1994). In United States v. Aguirre-Garcia, No. CR 08-0823 JB, 2009 WL 5851092 (D.N.M. Dec. 15, 2009)(Browning, J.), the Court found that a defendant was not entitled to a mitigating role adjustment, because the defendant, with two co-defendants, knowingly transported cocaine out of state on two occasions. See 2009 WL 5851092, at *1-3. Because Aguirre-Garcia had the same knowledge and took the same actions as his co-defendants, in driving a car which the defendants knew contained cocaine out of state, the Court found that Aguirre-Garcia was not entitled to a minor role adjustment, even though he had purportedly informed his co-defendants that he did not want to transport drugs and was only along for the ride. See 2009 WL 5851092, at *1-3. On the other hand, where a defendant charged for conspiring to distribute methamphetamine possessed only seven grams out of the 400 grams involved in the conspiracy, and no other evidence supported the defendant being more than a "user," the Court granted a minor role adjustment, because a preponderance of the evidence did not support that the defendant was a "dealer," as were his co-defendants in the conspiracy. United States v. Justice, No. CR 09-3078 JB, 2012 WL 394455, at *1-5, *9-10 (D.N.M. Jan. 23, 2012)(Browning, J.).

The Tenth Circuit's ruling in United States v. Ayers, 84 F.3d 382, 384 (10th Cir. 1996), is also instructive. In that case, the USPO's presentence report noted that, several weeks before his arrest, the defendant

> rented an apartment in Albuquerque, New Mexico and that a Mr. Paul Markland helped him pay for it. . . . Mr. Ayers knew that Mr. Markland was selling cocaine

and using the apartment to prepare and store crack cocaine, contact potential buyers, and store money. . . . Mr. Ayers acknowledged "that he had sometimes traveled with Markland to pick up money, and had sold cocaine for Markland on occasion over a period of several months." At the time of his arrest, police discovered 90.8 grams of crack cocaine, .4 grams of powdered cocaine, and 3 grams of marijuana in Mr. Ayers's apartment.

84 F.3d at 384 (quoting the presentence report). The Tenth Circuit acknowledged that there was no indication that the defendant arranged drug sales or made drug deliveries when he leased the apartment, but upheld the district court's refusal to grant a mitigating role adjustment. The Tenth Circuit reasoned that

> Mr. Ayers's admitted knowledge of Mr. Markland's drug dealing, his accompanying Mr. Markland in the collection of debts, and his allowing Mr. Markland to use the apartment are all factors supporting the inference that Mr. Ayers knowingly permitted Mr. Markland to use the apartment to sell drugs. It was therefore not clearly erroneous for the district court to find that . . . Mr. Ayers served an important function in [a] drug distribution network, such that he was not entitled to an offense level reduction under U.S.S.G. 3B1.2.

United States v. Ayers, 84 F.3d at 384.

The Tenth Circuit has also stated: "To debate whether couriers as a group are less culpable . . . [is] akin to the old argument over which leg of a three-legged stool is the most important leg." United States v. Martinez, 512 F.3d at 1276 (internal quotation marks and citations omitted). Madrid does not argue that the small quantity of Suboxone which she attempted to supply suggests that she is a minor participant, and the Tenth Circuit has held that "a qualitative, not quantitative, approach must guide the [minor role] determination." United States v. Moreno, 696 F. App'x 886, 895 (10th Cir. 2017)(unpublished). Madrid knew that she was transporting illegal drugs, purchased the drugs herself, followed instructions to conceal the drugs, used Mr.

Mondragon to attempt to smuggle the drugs into prison, and expected compensation in exchange for her services, and the telephone calls indicate that she has distributed Suboxone strips to inmates on multiple prior occasions. See PSR ¶¶ 7-9, at 4. Madrid was at least as involved in the attempt to smuggle Suboxone into prison as Chavez. She was aware of the full scope of the drug-trafficking operation, worked directly with Chavez, and was an integral player in the scheme. Based on these facts, the Court denies Madrid's request to apply a 2-level minor role reduction. Madrid is more than a courier. See United States v. Roybal, 188 F. Supp. 3d 1163, 1216 (D.N.M. May 24, 2016)(Browning, J.)(holding that Roybal was not a minor participant in a drug-trafficking operation where he was aware of the full scope of the operation and evidence suggested he was an integral player in the scheme, and not merely a passive observer). Madrid is not someone who carried a bag on a train but did not know what she was carrying. She and Chavez were the "average" participants. She is not a minor participant in the crime, but is just as involved as Chavez.

III. **THE COURT DENIES MADRID'S REQUEST TO ADJUST HER GUIDELINE RANGE DOWNWARD TO AVOID DISPARITY BETWEEN HER RANGE AND CHAVEZ' RANGE.**

At the hearing, Madrid contended that, although both Madrid and Chavez were "charged with the same conspiracy to distribute," because of a cross-reference in the Guidelines, Madrid's range is higher, because she provided rather than possessed contraband. Tr. at 14:1-6 (Henderson). Madrid cited to United States v. Smart, 518 F.3d 800 (10th Cir. 2008), in which the Tenth Circuit held "that it is clear that a co-defendant disparity is not a per se improper factor such that this is a consideration that would constitute procedural error." Tr. at 14:8-12 (Henderson). Madrid noted

that the Tenth Circuit "stated that a district court may also properly account for unwarranted disparities between co-defendants who are similarly situated and that the district court may compare defendants" when deciding sentences. Tr. at 14:12-16 (Henderson). Madrid proposes decreasing her base offense level to 13, to match Chavez', and then applying a reduction for acceptance of responsibility. See Tr. at 15:6-19 (Henderson). The United States contends that the facts justify the charging disparity, where Chavez "was never in actual possession of the prohibited items," and where Madrid "*provided and attempted to provide* the prohibited item for introduction into the facility." Response at 4 (emphasis in Response).

Madrid does not demonstrate why it was an abuse of the Court's discretion to decline to grant a downward variance in her case to correct for a sentencing disparity between her and Chavez. United States v. Smart, on which Madrid relies, addresses the propriety of a district court considering, under § 3553(a)(6), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." United States v. Smart, 518 F.3d at 804 (internal quotation marks omitted)(quoting § 3553(a)(6)). The Tenth Circuit does not require courts to exercise their discretion to grant a downward variance based on co-defendants' sentence disparity, although they may grant a variance. See United States v. Chavez-Torres, 359 F. App'x 75, 77 (10th Cir. 2010)(unpublished). The Tenth Circuit has held "that disparate sentences are permissible when they are warranted by the facts of the particular case." United States v. Chavez-Torres, 359 F. App'x at 66 (citing United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1223 (10th Cir. 2008)). The Tenth Circuit has stated that "a criminal

defendant alleging a disparity between his sentence and that of a co-defendant is not entitled to relief from a sentence that is properly within the sentencing guidelines and statutory requirements." United States v. Davis, 437 F.3d 989, 997 (10th Cir. 2006)(citing United States v. Blackwell, 127 F.3d 947, 951-52 (10th Cir. 1997)).

The Court varied downward from the Guideline range that the PSR calculated -- 70 to 87 months, see Response at 5 -- the equivalent of 1 offense level, to arrive at a working range of 63 to 78 months, and sentenced Madrid at the low end of that working range. See Tr. at 26:11-19 (Court). The Court thoroughly considered the applicable sentencing guidelines and the 18 U.S.C. § 3553(a) sentencing factors before imposing a sentence at the bottom of the working guideline range after applying the equivalent of a one-level variance. The Court factually differentiated Madrid's offense from Chavez' offense, because Madrid secured the Suboxone, gave it to Mr. Mondragon to deliver, and expected compensation in exchange for the delivery, whereas Chavez intended to receive the Suboxone, but did not perform conduct as culpable as Madrid's in committing the distribution conspiracy offense with which both were charged.

The Indictment charges Madrid with violating 18 U.S.C. § 1791(a)(1), a provision offense, and Chavez with violating 18 U.S.C. § 1791(a)(2), a possession offense.[13] See Indictment at 2.

---

[13]Section 1791 states in relevant part:

**(a) Offense.** -- Whoever --

> (1) in violation of a statute or a rule or order issued under a statute, provides to an inmate of a prison a prohibited object, or attempts to do so; or

The U.S.S.G. § 2P1.2(c)(1) cross reference applies only if the defendant is convicted under 18 U.S.C. § 1791(a)(1) and, therefore, applies to Madrid but not to Chavez, evidencing the United States Sentencing Commission's intent to elevate the base offense level to 26 only for individuals providing controlled substances to prisoners for the purposes of distribution. See U.S.S.G. § 2P1.2(c)(1). Providing controlled substances for distribution, particularly in the context of a federal prison -- where provision entails smuggling contraband into a federal prison -- is serious enough to warrant a base offense level higher than that assigned to inmates who possess contraband in violation of 18 U.S.C. § 1791(a)(2). The Supreme Court has recognized that "[d]rug smuggling and drug use in prison are intractable problems." Overton v. Bazzetta, 539 U.S. 126, 134 (2003). The Supreme Court stated that prison administrators, pursuant to their obligation to take reasonable measures to guarantee inmate safety, "must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today . . . ." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984). The United States Court of Appeals for the Eighth Circuit addressed the seriousness of smuggling contraband into a federal prison in United States v. Akers, 476 F.3d 602 (8th Cir. 2007):

> Drug dealing, in all its forms, creates a serious risk of potential harm to individuals and society. When it involves smuggling drugs into a correctional facility, however, additional and unique risks of harm to inmates and corrections staff arise.

---

(2) being an inmate of a prison, makes, possesses, or obtains, or attempts to make or obtain, a prohibited object;

shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 1791(a).

> For obvious reasons, the ability to control inmates and maintain order in a correctional facility is detrimentally affected when prisoners use illegal drugs.

United States v. Akers, 476 F.3d at 606.  Drugs would not enter correctional institutions but for the individuals, like Madrid, who facilitate their entry.  There is a legitimate penological interest in punishing those who facilitate the introduction of drugs into prison more harshly than those who receive contraband in prison, even when the receiving individuals have the intention of further distributing that contraband within the prison.  Although the Court recognizes the pressure to which Chavez subjected Madrid, Madrid, unlike Chavez, undertook volitional acts with the expectation of compensation, on numerous occasions, to introduce Suboxone to prisons, and the Court concludes that U.S.S.G. § 2P1.2(c)(1)'s cross reference's application to Madrid and not to Chavez does not produce an unjust or unwarranted sentencing disparity between defendants convicted of similar conduct.

Madrid's crime of smuggling drugs into prison is particularly a problem in the context of the three trials of the SNM prison gang members.  Drugs are very important to the gang.  They are the coin of the realm.  See, e.g., United States v. DeLeon, 326 F. Supp. 3d at 1264 ("SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotics traffickers.").  The fact that Madrid used a Criminal Justice Act Panel ("CJA panel") attorney, defending Chavez in the United States v. DeLeon case, to transport the Suboxone, and got him disqualified, scared that lawyer out of his mind, disrupted the proceeding, and forced a new lawyer to come into the case is particularly disturbing.  For the foregoing reasons, the Court denies Madrid's request to vary her sentence downward to decrease the disparity between Madrid

and Chavez.

IV.    **THE COURT DENIES MADRID'S REQUEST TO VARY HER BASE OFFENSE LEVEL TO 6, BECAUSE U.S.S.G. § 2P1.2(C)(1)'S APPLICATION AS A CROSS-REFERENCE DOES NOT ELEVATE MADRID'S BASE OFFENSE LEVEL TO <u>AN EXTENT DISPROPORTIONATE TO HER CRIME'S SEVERITY</u>.**

Madrid contends that the U.S.S.G. § 2P1.2(c)(1) cross-reference "has an unintended and unjust consequence in this case."  Objections at 2.  Madrid requests that the Court consider the analysis in <u>United States v. Cani</u>, in which Judge Conway considered an inmate convicted of distributing "0.10 grams of heroin to another inmate."  Objections at 7.

> The District Court compared his guidelines under § 2D1.1 and § 2P1.2(c)(1).  The Court noted that amount of heroin being distributed was minimal and how many of his crimes revolved around his own drug addiction.  The Court held that a 60 month sentence in comparison to a 262 months sentence was appropriate.

Objections at 7 (internal citations omitted).  Madrid contends that, although

> there are some distinctions between her and the defendant in that case the same analysis applies.  If she were to receive a variance to a base offense level of 6 it would be in consideration of the fact that she attempted to distribute what the chemical lab reports said was residue of suboxone -- an extremely minimal amount of controlled substance.  She did so at the behest of her codefendant.  She herself has a long history of drug abuse both before and after her marriage to her codefendant, but didn't become addicted to heroin until Chavez.

Objections at 7 (internal citations omitted).  First, the Court notes that the evidence suggests that Madrid intended to distribute two strips of Suboxone.  Paragraph 9 of the PSR indicates that, during a telephone call, Madrid told Chavez that she had "10 pictures for Chavez's friend and also 10 pictures for Chavez," which she mailed to Mr. Mondragon's office, intending Mr. Mondragon to unknowingly deliver them to Chavez in prison.  PSR ¶ 9, at 4.  The USPO indicates that "pictures" is code for Suboxone.  PSR ¶ 8, at 4.  Although the Chemical Analysis Report suggests no more

than Suboxone residue on the strips Madrid attempted to distribute, the evidence suggests that Madrid intended to distribute more than residue.  See PSR ¶¶ 8-9, at 4.  Although Madrid received instructions and threats from Chavez, Madrid also expected to receive compensation for her services and had delivered Suboxone to inmates on prior occasions.  See PSR ¶¶ 8-9, at 3-4.  Furthermore, in United States v. Cani, Judge Conway noted the lack of evidence "that Cani was involved in actually smuggling drugs into the prison," amongst the factors militating in favor of a lower, non-Guidelines sentence.  United States v. Cani, 545 F. Supp. 2d at 1241.  Judge Conway determined "that an appropriate sentence is 60 months total imprisonment."  United States v. Cani, 545 F. Supp. 2d at 1240-41.  The Court thus concludes that Madrid's case -- in which the Court sentences her to a term of 63 months imprisonment followed by supervised release -- is unlike United States v. Cani, primarily because Madrid was integrally and intentionally involved in the scheme to smuggle drugs into the prison.

Furthermore, although Madrid makes much of the small quantity she sought to and actually did distribute, United States Courts of Appeals which have considered the U.S.S.G. § 2P1.2(c)(1) cross-reference have applied it regardless of the amount of drugs involved.  See, e.g., United States v. Gregory, 315 F.3d 637, 643 (6th Cir. 2003)(holding that the section 2P1.2(c)(1) cross-reference applies to persons who provide even very small amounts of contraband to incarcerated persons in violation of 18 U.S.C. § 1791(a)(1), and not to persons who are already incarcerated and attempt to make, possess, or obtain, or attempt to make or obtain a prohibited object in violation of 18 U.S.C. § 1791(a)(2)); United States v. Zambrana, 151 F.3d 1034, 1034, 1998 WL 516779, at *2

(7th Cir. 1998)(unpublished table opinion)(rejecting a defendant's argument that applying the U.S.S.G. § 2P1.2(c)(1) cross-reference would be unjustly harsh in light of the extremely low purity level of the heroin the defendant attempted to provide to an inmate); United States v. Torrejon, 81 F.3d 171, 171, 1996 WL 137091, at *2 (9th Cir. 1996)(unpublished table opinion)(holding that applying the U.S.S.G. § 2P1.2(c)(1) cross-reference is appropriate even where the distribution offense involves a small amount of drugs).  Madrid was actively involved in the distribution scheme.  She intended to deliver multiple units of Suboxone.  She was the sole individual responsible for the attempt to get the Suboxone into the prison.  Her offense differs from Chavez, because she attempted to provide contraband to an inmate, and Chavez, as an inmate, attempted to possess contraband -- the United States Sentencing Commission drafted U.S.S.G. § 2P1.2(c)(1) cross-reference in a manner accounting for a difference between providing contraband to an inmate and receiving contraband as an inmate.  The cross-reference's enhancement is not unjust.  The Court has no Kimbrough disagreement with it, either in general or as applied to this case.

**V.  THE COURT WILL, CONSIDERING THE 18 U.S.C. § 3553(a) FACTORS, ASSIGN MADRID A SENTENCE OF 63 MONTHS IMPRISONMENT FOLLOWED BY THREE YEARS OF SUPERVISED RELEASE.**

Section 3553(a) of the Federal Sentencing Act lists "[f]actors to be considered in imposing a sentence."  18 U.S.C. § 3553(a).  A sentencing judge, in considering the § 3553(a) factors, must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth

in paragraph (2) of this subsection." 18 U.S.C. § 3553(a).[14]  The Court concludes, after

considering the § 3553(a) factors, that the working range at which it arrived, of 63 to 78 months,

---

[14]Section 3553(a) counsels the sentencing judge to consider:

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed --

  **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  **(B)** to afford adequate deterrence to criminal conduct;

  **(C)** to protect the public from further crimes of the defendant; and

  **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for --

  **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines --

   **(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

   **(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

and the sentence it assigned, of 63 months, is appropriate and adequately complies with the purposes set forth in 18 U.S.C. § 3553(a)(2). See Tr. at 26:11-19 (Court).

The Court has, as this record reflects, carefully considered the Guidelines, but, in arriving at its sentence, has taken account of not only the Guidelines, but its other sentencing goals. Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant. The Court has identified about thirteen factors that put downward pressure on the sentence, counseling for a

---

     **(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement --

     **(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

     **(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

downward variance from the Guidelines. Some of these factors overlap, and some go on both sides of the ledger, also putting upward pressure to keep the sentence in the Guidelines range. First, the Court recognizes the pressure that Chavez put on Madrid to commit this crime. <u>See</u> Threatening Letters, Instructing Letters, PSR ¶ 7, at 4. Second, the offense involved no acts of violence. <u>See</u> PSR ¶ 96, at 21. Third, while the parties do not dispute, other than the possibility of a minor role reduction, the USPO's Guidelines calculation, the result is a higher Guidelines range than the parties may have expected. Fourth, Madrid admitted she has a problem with heroin and expressed interest in additional counseling and has participated in multiple substance abuse programs in the past, for which she has obtained four certificates of achievement and completion, and three certificates of attendance for completing anger management classes while in custody pending sentencing. <u>See</u> Certificates, PSR ¶ 96, at 21. Fifth, one of the factors that almost always puts downward pressure -- although it may also in many cases, including this one, put upward pressure on the sentence -- is the need for the sentence to provide just punishment. Sixth, one of the factors that almost always puts downward pressure -- although it too may in many cases, including this one, also put upward pressure on the sentence -- is the need for the punishment to promote respect for the law; a sentence that the community and the bar do not regard as showing that the Court missed the mark. Seventh, the offense involved a small quantity of drugs. <u>See</u> PSR ¶ 96, at 21. Eighth, Madrid has many problems, but the Court uses, and substitutes for incarceration, supervised release to address the issues that got her to the problems, especially her drug problems. Ninth, while the task of the Court, as a district court judge, is not just to come up

with a reasonable sentence, but to calculate a sentence that fairly, effectively, and fully promotes the § 3553(a) factors, see United States v. Roybal, 188 F. Supp. 3d at 1220; United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section § 3553(a)(2)." (citation omitted)) -- the Court is always mindful that the defendant, the Tenth Circuit, and the public will ultimately review the sentence for reasonableness; that perception often -- as in this case -- puts downward pressure on the sentence. Tenth, what reasonableness for a district judge means is that the sentence is not greater than necessary to promote the goals of § 3553(a). Eleventh, Madrid has accepted responsibility for what she did. Specifically, on July 12, 2018, Madrid, through defense counsel, provided the following statement verbatim:

> Around November and December of 2017, I agreed to bring in suboxone, via my co-defendant's attorney, into the Hidalgo County Detention Center to be delivered to Chris for distribution. I was aware that the common purpose of our agreement was to deliver the suboxone (contraband) to my co-defendant Chris, who was an inmate at Hidalgo County Detention Center [("HCDC")]. HCDC is in New Mexico.

PSR ¶ 14, at 5. Twelfth, Madrid may be able to get her act together if she can resolve her drug problem; federal dollars and support can help with that issue more than incarceration and, indeed, the Court cannot and should not use incarceration to address her drug problems. Thirteenth, the factor that casts an overwhelming shadow over Madrid and the case is her relationship with the co-Defendant, Chavez; while the Court cannot and would not order her to never have anything to do with Chavez ever again, the reality is that, with this one decision, to get him out of her life, she

could solve a lot of her problems.

There are many -- indeed, more -- factors that put upward pressure on the sentence. The Court has identified about eighteen factors that put upward pressure on the sentence to keep it in the Guidelines range. First, the seriousness of the offense puts upward pressure to keep it in the Guidelines range; as these SNM cases show, prisons are violent, dangerous places with gangs. Madrid's attempt in this case, especially using Mr. Mondragon -- an unwitting CJA-panel attorney appointed by the Court -- to introduce drugs into that environment -- which only fuels and funds the violence and racketeering activity -- is particularly concerning. Second, given the seriousness of the crime, this sentence must promote respect for the law. Third, also related to the seriousness of the crime, this sentence must provide just punishment. Fourth, the Court has to afford adequate deterrence, at a specific level as to Madrid. Fifth, the Court has to afford adequate deterrence at a general level -- to other men and women outside of prison -- for example, girlfriends, family members, or gang members -- tempted, asked, or pressured to bring drugs and other contraband to prison and introduce it into a criminal environment that thrives on drugs and other contraband. Sixth, closely related to deterrence, both specific and general, the Court must protect the public from the criminal behavior. Seventh, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct puts upward pressure to keep Madrid's sentence a Guidelines sentence. Eighth, again, the need to produce a reasonable sentence counsels for a Guidelines sentence -- or at least exerts upward pressure on the sentence -- where there are no facts that suggest a downward departure is appropriate. Ninth, what

reasonableness means for a district judge is that the sentence is sufficient to promote the § 3553(a) goals. Tenth, her relationship with the co-Defendant, Chavez, continues to put upward pressure on the sentence; until she decides to give him up, she probably will have a rocky, in-and-out-of-jail/prison life, engaging in criminal activity. That is his lifestyle, and if she hangs around him, she will probably do what he does. Eleventh, while Madrid minimizes her role in the crime, Chavez cannot possess the drugs unless she provides them, so there is no crime here if she -- on the outside -- just says no to a man who is in prison. Twelfth, the Court does not have a <u>Kimbrough</u> disagreement with the Guidelines or the cross-reference; thus, the Guidelines range is the starting point rather than a ground to vary. Thirteenth, Madrid's actions would have, if successful, likely furthered SNM's racketeering conduct, which, in many ways, is built on drug trafficking. Fourteenth, Madrid has performed poorly on pretrial release, testing positive for drugs. Fifteenth, Madrid has a lengthy criminal history involving violent offenses, although her last conviction was in 2010. <u>See</u> PSR ¶¶ 29-43, at 6-12. Sixteenth, Madrid has a history of violating her supervision, and her conditions of release were terminated when she continued to use heroin. <u>See</u> PSR ¶ 32, 36, 37, at 8, 10-11. Seventeenth, Madrid has a history of mental health problems. <u>See</u> PSR ¶¶ 57-59, at 14-15. Eighteenth, the USPO worked with Madrid a lot on pretrial supervision and was very sympathetic to her situation, affording her a lot of opportunities, and she still did not perform well. <u>See</u> PSR ¶ 4, at 3.

The Court concludes that the punishment set forth in the Guidelines is not appropriate for this sort of offense. The Court has considered the kinds of sentences and ranges that the Guidelines

establish.  The Court concludes that a sentence of 63 months is necessary, but also adequate, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence -- both at a specific and a general level -- protect the public, avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and, because the Court has placed her on supervised release, effectively provides Madrid with needed education, training, and care to deal with the problems that have brought her to this point.  In sum, the Court believes that the sentence given fully reflects each of the factors which 18 U.S.C. § 3553(a) embodies.  The Court also believes this sentence is reasonable.  The Court believes that the sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

Normally, in this case, where the upward factors -- both quantitatively and qualitatively -- outweigh the downward factors, the Court would keep the sentence in the Guidelines range and sentence at the bottom of the Guidelines range.  The Court rarely sentences higher in the range unless there is an aggravating factor, and while Madrid's crime is a serious one, there is not something present that is so serious that it deserves or warrants that the Court crawl up in the Guidelines range.  The nature of the crime is a routine conspiracy to distribute Suboxone and attempt to provide contraband in prison.  See PSR at 1.

The Court did something different here.  Despite its conviction that a sentence at the low end of the sentencing range was appropriate, the Court stepped back and took another, from 30,000 feet, look at whether a 70-month sentence is appropriate.  The Court was particularly influenced

by the recommendation of the United States Probation Officer Mindy Pirkovic, a seasoned United States Probation Officer for which this Court has great respect given her sound counsel to the Court over the last six years, that there should be a variance. In part F of the PSR, paragraph 96, on pages 21 and 22, Pirkovic listed her own factors that she thought justified a variance:

96.     After assessing the details of the instant offense, and the defendant's social and criminal history, the following unique factors that relate to 18 U.S.C. 3553(a)(1)-(7), have been identified.

### *Nature and Circumstances of the Offense and History and Characteristics of the Defendant*

- The defendant conspired to distribute two suboxone strips, a narcotic drug, into a correctional facility. Recorded jail calls indicate the defendant was involved in distributing suboxone to inmates on multiple occasions. The instant offense did not involve any acts of violence.

- The defendant admitted she has a problem with heroin and she continued to use heroin while she was on conditions of release. She has attended multiple substance abuse programs in the past and she received four certificates of achievement for completing substance abuse classes while in custody pending sentencing. The defendant has expressed interest in additional substance abuse counseling.

- The defendant has a lengthy criminal history involving violent offenses. Her last conviction was in 2010. She has a history of violating her supervision.

- The defendant is presently single and has an adult child.

- The defendant has a lengthy employment history. She graduated high school and attended college for two years. The defendant is interested in furthering her education.

### *Avoid Unwarranted Sentencing Disparities*

- The defendant had a lesser role in the offense; however, she has a higher guideline imprisonment range than the codefendant. The sentencing

> guidelines are more punitive towards the defendant as she was the one who attempted to provide the narcotic substance in a correctional facility. They both have lengthy criminal histories.

PSR ¶ 96, at 21-22. In the end, while the Court does not agree with every word that Pirkovic wrote as her justification for a variance, the Court was persuaded some variance is appropriate.

Thus, pursuant to 18 U.S.C. § 3553(a)(1)-(7), the Court has determined the following sentencing factor(s) exist that warrant a sentence outside the applicable guideline range: (i) the nature and circumstances of the offense and the history and characteristics of the defendant, pursuant to 18 U.S.C. § 3553(a)(1), and (ii) the need to avoid unwarranted sentencing disparities among defendants, pursuant to 18 U.S.C. § 3553(a)(6). After evaluating the factors listed above, the Court concludes that Madrid committed the offense as she felt pressured by the co-Defendant, Chavez, and she needed money. The offense involves a small quantity of drugs. The offense for which the Court sentences Madrid does not involve any acts of violence. Madrid used heroin while on conditions of release and her conditions of release were subsequently terminated after she continued to use heroin. She admitted that she has a problem with heroin and expressed interest in additional counseling. Madrid has participated in multiple substance abuse programs in the past. She obtained four certificates of achievement for completing substance abuse classes and three certificates of attendance for completing anger management classes while she has been in custody pending sentencing. She has a lengthy criminal history involving violent offenses; however, her last conviction was in 2010. Madrid has a history of violating her supervision. She has a history of mental health problems. Madrid has a lengthy employment history and has completed two years of community college. Madrid's Guidelines range was higher than Chavez'

Guidelines range. Based on these conclusions, the Court has determined a sentence below the advisory guideline imprisonment range will be reasonable and sufficient, but not greater than necessary, to accomplish the sentencing goals set forth in 18 U.S.C. § 3553(a). The Court notes Madrid conspired to distribute two -- but only two -- Suboxone strips into a correctional facility.

Thus, the only remaining issue is what the variance should be. Because the Court thinks all other factors counsel a Guidelines sentence, the Court concludes that any variance should be small. While Madrid thinks that the variance should be greater, the Court has worked hard to put the sentence down this low. In the Court's view, 18 U.S.C. § 3553(a) does not counsel a lower sentence.

**IT IS ORDERED** that: (i) the Defendant's Objection to the Presentece [sic] Report and Sentencing Memorandum, filed September 11, 2018 (Doc. 62), is sustained in part and overruled in part; (ii) Suboxone quantity may not be calculated by dosage, and Federal Bureau of Investigation Special Agent Bryan Acee's dosage determination is arbitrary, so the Court will sustain Defendant Yvonne Madrid's Objection and will not consider Acee's testimony as to the units of Suboxone or their value in prison evidence relevant to sentencing, although the Court notes that sustaining this Objection does not affect Madrid's base offense level, which is 26; (iii) the Court overrules Madrid's Objection requesting a minor role adjustment, concluding that Madrid played an essential role when she purchased or secured the Suboxone, and provided it to CJA-panel attorney Orlando Mondragon for delivery to Defendant Christopher Chavez, and where telephone calls between her and Chavez suggest this crime is not her first time securing Suboxone

for an inmate; (iv) the Court denies Madrid's request to vary her sentence downward to eliminate the disparity between her sentence and Chavez' sentence, considering the 18 U.S.C. § 3553(a) factors, including the need to avoid unwarranted sentencing disparities between similar defendants found guilty of similar conduct, and a need to promote respect for the law, provide just punishment, and reflect the offense's seriousness; (v) the Court declines to follow United States v. Cani, 545 F. Supp. 2d 1235 (M.D. Fl. 2008), and assigns Madrid a base offense level of 26, pursuant to U.S.S.G. § 2P.12(c)(1); and (vi) considering the 18 U.S.C. § 3553(a) factors, the Court assigns Madrid a sentence of 63 months of imprisonment, followed by three years of supervised release.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew M. Beck
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Shammara H. Henderson
Freedman Boyd Hollander Goldberg Urias & Ward, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendant*